ACCEPTED

# NO. 07-18-00026-CV

# SEVENTH DISTRICT COURT OF APPEALS

## Amarillo, Texas

FILED IN
7th COURT OF APPEALS
AMARILLO, TEXAS
3/23/2018 7:09:40 PM
VIVIAN LONG
CLERK

_____

## KAREN LINDSEY SMITH

### v.

## TERRY P. PROVINCE

_____

On Appeal from Cause No. CV-2016-00729
County Court of Law #2, Denton County, Texas
Honorable Robert Ramirez, Judge Presiding

---

## APPELLANT'S BRIEF

---

PAUL FLANNIGAN
State Bar No. 24012633
paul@flanniganlawfirm.com
MARK D. JOHNSON
State Bar No. 10770175
mark@flanniganlawfirm.com

FLANNIGAN & JOHNSON, P.L.L.C.
5600 Tennyson Parkway, Suite 330
Plano, Texas 75024
Phone: (972) 383-9377
Fax: (844) 287-8882

**ATTORNEYS FOR APPELLANT**

**ORAL ARGUMENT NOT REQUESTED**

## IDENTITIES OF PARTIES AND COUNSEL

**Appellant**
Karen Lindsey Smith

**Counsel for Appellant**
Paul Flannigan
Paul@Flanniganlawfirm.com
Mark D. Johnson
Mark@Flanniganlawfirm.com
FLANNIGAN & JOHNSON, P.L.L.C.
5600 Tennyson Parkway, Suite 330
Plano, Texas 75024

**Appellee**
Terry P. Province

**Counsel for Appellee**
Brantley J. Saunders
Brantley@SaundersWalsh.com
Abigail K. Christmann
Abby@SaundersWalsh.com
SAUNDERS, WALSH & BEARD
Craig Ranch Professional Plaza
6850 TPC Drive, Suite 210
McKinney, Texas 75070

# TABLE OF CONTENTS

IDENTITIES OF PARTIES AND COUNSEL     i

TABLE OF CONTENTS     ii

INDEX OF AUTHORITIES     iv

STATEMENT OF THE CASE     vi

STATEMENT REGARDING ORAL ARGUMENT     vii

ISSUES PRESENTED     viii

STATEMENT OF FACTS     ix

SUMMARY OF ARGUMENT     xiii

STANDARD OF REVIEW     xiv

ARGUMENT     1

*Issue 1* -- This Court should reverse and remand because the Trial Court erred when it struck evidence offered by Smith regarding the well-known tendencies of the breeds (German Shepherd Dog and Boxer) making up the Attack Dog.     1

*Issue 2* – This Court should reverse and remand because the Trial Court erred when it granted summary judgment to Province, despite the fact that Smith offered competent summary judgment evidence (some of which Province did not oppose) indicating (a) the aggressive tendencies of the breeds (in part German Shepherd Dog and Boxer) comprising the Attack Dog, (b) that Province permitted a hole to exist in his gate, at the main point of ingress and egress to his property, (c) that Province knew the Attack Dog could stick its head through the hole, and

potentially could bite anyone (including a licensee such as Smith) who came to the gate, and (d) Smith was seriously injured when the Attack Dog in fact stuck its head through the hole, and bit her in the neck. 4

PRAYER                                                                              10

# INDEX OF AUTHORITIES

## Cases

*Allen ex rel. B.A. v. Albin*, 97 S.W.3d 655, 666 (Tex. App.—Waco 2002, no pet.) .................... xxii

*Casso v. Brand,* 776 S.W.2d 551, 558 (Tex. 1989) ...................................................... xvi

*Dolcefino v. Randolph*, 19 S.W.3d 906, 930 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (op. on reh'g) ........................................................................ xvii

*Dunnings v. Castro*, 881 S.W.2d 559, 563 (Tex. App.—Houston [1st Dist.] 1994, writ denied) . xx

*El Dorado Motors, Inc. v. Koch*, 168 S.W.3d 360, 366 (Tex. App.—Dallas 2005, no pet.)........ xvi

*Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396, 32 Tex. Sup. Ct. J. 217 (Tex. 1989).... xiv

*Labaj v. VanHouten*, 322 S.W.3d 416, 420 (Tex. App.—Amarillo 2010, no pet.)....................... xx

*Lewis v. Great Southwestern Corporation*, 473 S.W.2d 228, 230 (Tex.Civ.App.—Fort Worth 1971, writ ref'd n.r.e.) ................................................................................... xix

*LSR Joint Venture No. 2 v. Callewart,* 837 S.W.2d 693, 698 (Tex. App.-Dallas 1992, writ denied) (op. on reh'g). ........................................................................................ xiv

*Marshall v. Ranne,* 511 S.W.2d 255 (Tex. 1974) ...................................................... xix

*Moore v. K Mart Corp.,* 981 S.W.2d 266, 269 (Tex. App.--San Antonio 1998, pet. denied)........ xv

*Muela v. Gomez*, 343 S.W.3d 491, 496 (Tex. App.—El Paso 2011, no pet.)............................... xx

*Robinson v. Warner-Lambert Co.,* 998 S.W.2d 407, 410 (Tex. App.--Waco 1999, no pet.) ........ xiv

*Rodriguez v. Haddock,* 2003 WL 1784923 at *2 (Tex.App.—Fort Worth, April 3, 2003, no pet.) ........................................................................................................ xix

*Rucker v. Bank One Texas, N.A.,* 36 S.W.3d 649, 653 (Tex. App.--Waco 2000, pet. denied)...... xiv

*Sasser v. Dantex Oil & Gas, Inc.,* 906 S.W.2d 599, 602 (Tex. App.--San Antonio 1995, writ denied)

............................................................................................................ xiv

*Stein v. Reger,* 2016 Tex. App. LEXIS 5961, 2016 WL 3162589 (Tex. App.—Houston [1st Dist.]

2016) ...................................................................................................................... xix

*Trico Techs. Corp. v. Montiel,* 949 S.W.2d 308, 310 (Tex. 1997)................................................. xvi

*Yzaguirre v. KCS Res., Inc.,* 47 S.W.3d 532, 543 (Tex. App.-Dallas 2000), aff'd, 53 S.W.3d 368, 44

Tex. Sup. Ct. J. 973, 44 Tex. Sup. Ct. J. 1122 (Tex. 2001) ........................................... xiv

## Statutes

TEX. R. APP. P. 44.1(a)(1)........................................................................................................ xiv

TEX. R. EVID. 801(d) .............................................................................................................. xvii

TEX. R. EVID. 803(21) ............................................................................................................. xvii

## STATEMENT OF THE CASE

The Appellant, KAREN LINDSEY SMITH ("Smith"), Plaintiff below, filed this negligence action on March 30, 2016 for damages caused when she was bitten by a dog owned by the Appellee, TERRY P. PROVINCE ("Province"), Defendant below.

Province filed a Second Amended Motion for Summary Judgment (the "Motion") on or about October 5, 2017. (CR 243-275). In the Motion, Province contended that he was not liable for damages caused by his dog. Smith responded to the Motion (the "Response") on or about November 7, 2017. (CR 282-374). Province filed a reply to the Motion on or about November 10, 2017. (CR 375-385).

Judge Robert Ramirez of County Court No. 2 of Denton County, Texas (the "Trial Court") heard the Motion. Judge Ramirez granted the Motion on November 13, 2017. (CR 386). Judge Ramirez also sustained Province's objections to certain summary judgment evidence offered by Smith in her response. (CR 387-388).

# STATEMENT REGARDING ORAL ARGUMENT

Oral argument is not requested.

# ISSUES PRESENTED

*Issue 1* – Whether the Trial Court erred when it struck evidence by Smith regarding the well-known tendencies of the breeds (in part German Shepherd Dog and Boxer) making up the Attack Dog.

*Issue 2* – Whether the Trial Court erred when it granted summary judgment to Province, despite the fact that Smith offered competent summary judgment evidence (some of which Province did not oppose) indicating (a) the aggressive tendencies of the breeds (in part German Shepherd Dog and Boxer) making up the Attack Dog, (b) that Province permitted a hole to exist in his gate, at the main point of ingress and egress to his property, (c) that Province knew the Attack Dog could stick its head through the hole, and potentially could bite anyone (including a licensee such as Smith) who came to the gate, and (d) Smith was seriously injured when the Attack Dog in fact stuck its head through the hole, and bit her in the neck.

# STATEMENT OF FACTS

1.     This lawsuit involves a vicious attack (the "Attack") by one of Province's dogs upon Smith.  (C.R. 7-39; *Plaintiff's Original Petition*).  On January 4, 2016, Smith was working for United Parcel Service ("U.P.S.").  *Id.*  Smith was a temporary, holiday season employee for U.P.S., but was working with an experienced driver.  *Id.*

2.     Smith and her co-worker were dispatched to Province's home in Ponder to deliver a package.  (C.R. 7-39; *Plaintiff's Original Petition*).  Smith's co-worker warned Smith that Province kept dogs on his property.  *Id.*  To avoid any interaction with Province's dogs, Province's wife claims "before the incident at issue, [she] told delivery persons to put packages on the ground outside the gate/fence, and not attempt to put them over the fence."  (C.R. 246, 274).  In the Motion (but not in the Original Motion), Province claims this instruction was given not because of the dogs' violent tendencies, but instead because "[Province and his wife] do not like strangers coming onto [their] property.  [Province and his wife] also fear that someone opening the gate and entering [their] property might not close and secure the gate properly when leaving the property, thereby making it possible for [their] dogs to escape [their] property."  (C.R. 260, 274).

3.     After driving to Province's home, Smith exited the U.P.S. truck.  (C.R. 285).  Smith saw two dogs on Province's property, but did not see a third dog.  *Id.*

Smith set the package outside the gate, as she was instructed by her U.P.S. co-worker. *Id.* Smith does not specifically recall whether she laid the package on the ground, leaned the package against the gate post, or gently tossed the package to the ground. *Id.*

4. While Smith was leaving the package outside the gate, a third dog (the "Attack Dog") approached. (C.R. 285). Without any warning, the Attack Dog stuck its head through an opening in the gate, and bit Smith in the neck. *Id.* No one knows precisely why the Attack Dog acted this way, but Smith (who was the only person in direct proximity with the Attack Dog) has testified "the [Attack Dog] obviously wanted the package or wanted some type of toy or something. It was a little bit aggressive more than the norm. So it made a point of coming through the fence more than like a worst-case scenario." *Id.*

5. Unfortunately, the Attack was both foreseeable and preventable. The Attack Dog is a large dog, weighing approximately 100 pounds. The Attack Dog is a mixed breed dog, comprised primarily of German Shepherd Dog and Boxer. (C.R. 299-304; *see DNA Analysis,* a copy of which is attached as Exhibit A to the Response). Statistically, these dogs are extraordinarily dangerous. (C.R. 306-307; *see 14 Dog Breeds Blacklisted by Insurance Companies* [Psychology Today, May 27, 2014], a copy of which is attached as Exhibit B to the Response). In fact, according to Forbes and Dog's World, the German Shepherd Dog is the fourth most

dangerous breed, and the Boxer is the eighth most dangerous breed. (C.R. 308-322; *see* Exhibits C and D to the Response). This does not mean that a particular dog of these breeds may be vicious; it does mean, however, that these breeds present a heightened risk, requiring greater care.

6.    At very little time or expense, Province could have protected Smith from the Attack Dog, but chose not to do so. Province has a wire fence around his property, with a gate at the primary point of ingress/egress. (C.R. 358-359; *see T. Province Depo* [excerpts of which are attached as Exhibit F to the Response] at p. 33, l. 17 to p. 34, l. 8). There are gaps in the gate. *Id.* Province knew there were openings in the gate "large enough for a dog that felt threatened, like [the Attack Dog], to stick its nose through." *Id.*

7.    Province and his wife have several dogs, some of which are "outside" dogs. In order to keep the smaller dogs on Defendant's property, he installed chicken wire over lower gaps in the gate. (C.R. 353-354; *see T. Province Depo* [excerpts of which are attached as Exhibit F to the Response] at p. 28, l. 21 to p. 29, l. 8). However, he did not cover the entire gate with chicken wire because "that's just how much wire [he] had at the time." *Id.* Had he done so, the Attack Dog would not have been able to stick his snout through the gate, and would not have been able to bite Smith.

8.      Province's indifference to the public's safety is clearly shown by his actions following the Attack.  During his deposition, Smith's counsel asked Province what repairs, if any, he made to the gate after the Attack:

> Q.      Sir, since the time of the [Attack], have you made any changes to the gate?
>
> A.      No.
>
> Q.      You haven't put chicken wire all the way up?
>
> A.      No.
>
> Q.      *So if someone came to the gate and dropped a package again, this same thing, [the Attack Dog] could bite that person again?*
>
> A.      *I – I have no expectation that that would happen at all.*
>
> Q.      *But it would be possible.*
>
> A.      *It would be, in my opinion, monumentally improbable, but not impossible.*

(C.R. 368; *see T. Province Depo* [excerpts of which are attached as Exhibit F to the Response] at p. 43, ll. 1-14).

## SUMMARY OF ARGUMENT

*Issue 1* – Smith respectfully submits that this Court should reverse and remand because the Trial Court erred when it struck evidence by Smith regarding the well-known tendencies of the breeds (in part German Shepherd Dog and Boxer) comprising the Attack Dog.

*Issue 2* – Smith respectfully submits that this Court should reverse and remand because the Trial Court erred when it granted summary judgment to Province, despite the fact that Smith offered competent summary judgment evidence (some of which Province did not oppose) indicating (a) the aggressive tendencies of the breeds (in part German Shepherd Dog and Boxer) comprising the Attack Dog, (b) that Province permitted a hole to exist in his gate, at the main point of ingress and egress to his property, (c) that Province knew the Attack Dog could stick its head through the hole, and potentially could bite anyone (including a licensee such as Smith) who came to the gate, and (d) Smith was seriously injured when the Attack Dog in fact stuck its head through the hole, and bit her in the neck.

# STANDARD OF REVIEW

*Issue 1* – This Court reviews a trial court's decision on the admission of evidence under an abuse of discretion standard. *Yzaguirre v. KCS Res., Inc.,* 47 S.W.3d 532, 543 (Tex. App.-Dallas 2000), aff'd, 53 S.W.3d 368, 44 Tex. Sup. Ct. J. 973, 44 Tex. Sup. Ct. J. 1122 (Tex. 2001); *LSR Joint Venture No. 2 v. Callewart,* 837 S.W.2d 693, 698 (Tex. App.-Dallas 1992, writ denied) (op. on reh'g). To obtain reversal of a judgment based on the admission or exclusion of evidence, the appellant must show the trial court's ruling was in error and the error probably caused the rendition of an improper judgment. TEX. R. APP. P. 44.1(a)(1); *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396, 32 Tex. Sup. Ct. J. 217 (Tex. 1989).

*Issue 2* – This Court reviews summary judgment de novo. *Rucker v. Bank One Texas, N.A.,* 36 S.W.3d 649, 653 (Tex. App.--Waco 2000, pet. denied) (citing *Sasser v. Dantex Oil & Gas, Inc.,* 906 S.W.2d 599, 602 (Tex. App.--San Antonio 1995, writ denied)) . This Court applies the same standard in reviewing a no-evidence summary judgment as it would in reviewing a directed verdict. *Robinson v. Warner-Lambert Co.,* 998 S.W.2d 407, 410 (Tex. App.--Waco 1999, no pet.) . This Court reviews the summary-judgment evidence in the light most favorable to the nonmovant, disregarding all contrary evidence and inferences. *Id.* A no-evidence summary judgment will be defeated if the non-movant produces more than

a scintilla of probative evidence to raise a genuine issue of material fact on the elements challenged by the movant. *Moore v. K Mart Corp.,* 981 S.W.2d 266, 269 (Tex. App.--San Antonio 1998, pet. denied) .

# ARGUMENT

**I.** **This Court should reverse and remand because the Trial Court erred when it struck evidence offered by Smith regarding the well-known tendencies of the breeds (German Shepherd Dog and Boxer) making up the Attack Dog.**

1.      One of the primary issues in this lawsuit is whether the Attack Dog had vicious tendencies prior to the Attack.  In order to demonstrate the Attack Dog's "peacefulness," Province offered (a) a picture of the Attack Dog lying next to a cat and (b) affidavits of Province and his wife stating "[the Attack Dog] has *no vicious tendencies* and had never bitten anyone before the incident at issue."  (CR 259-260, 274-275;  *see Affidavit of Terry Province* [Motion at Exh. A] [emphasis added] and *Affidavit of Renee Province* [Motion at Exh. D] [emphasis added]).

2.      Plaintiff objected to the Affidavits of Terry Province and Renee Province on the grounds they are self-serving and conclusory.    (C.R. 288-289).  Under Texas law, a self-serving affidavit (*i.e.* an affidavit offered by a person with an interest in the outcome of the lawsuit) can be admissible summary judgment evidence, but must contain statements that may be confirmed or denied by independent evidence.  *Trico Techs. Corp. v. Montiel,* 949 S.W.2d 308, 310 (Tex. 1997); *Casso v. Brand,* 776 S.W.2d 551, 558 (Tex. 1989)Similarly, conclusory statements in affidavits are not proper summary judgment evidence if there are no facts to support the conclusions. *El Dorado Motors, Inc. v. Koch*, 168 S.W.3d 360, 366 (Tex. App.—Dallas 2005, no pet.) ; *Dolcefino v. Randolph*, 19 S.W.3d 906, 930

1

(Tex. App.—Houston [14th Dist.] 2000, pet. denied) (op. on reh'g).

3.     In order to refute Province's unsupported (and self-serving) contention that he was unaware of any "vicious tendencies" the Attack Dog might have, Smith offered internet articles regarding the well-known tendencies of German Shepherd Dogs and Boxers.  (C.R. 305-322; *Response* at Exhs. B, C, and D).  Province objected to these articles, claiming they were hearsay.  (C.R. 375-384).  The Trial Court sustained these objections, and struck Exhibits B, C, and D from the Response.  (C.R. 387-388).

4.     Under Texas law, an out-of-court statement constitutes hearsay if it is used to prove the truth of the matter asserted.  TEX. R. EVID. 801(d).  Exhibits B, C, and D are not hearsay for the simple reason that they are not offered to prove that German Shepherd Dogs and Boxers in fact are hyper-aggressive breeds.  Instead, these Exhibits are offered to demonstrate that it is *common knowledge* that members of these breeds may have aggressive traits.  In this way, Exhibits B, C, and D speak to the breeds' "reputation."   "Reputation" is an exception to the general rule regarding hearsay.  TEX. R. EVID. 803(21).

5.     German Shepherd Dogs' and Boxers' "reputation" for aggressiveness is relevant to Smith's negligence claims in this lawsuit.  Smith has called into question whether Province acted as a reasonable and responsible property owner when he intentionally left large holes in the gate to his property – holes large enough

2

that the Attack Dog could stick her head through them.  If the Attack Dog had been a teacup poodle, Province could argue persuasively that such breed's reputation for aggressiveness (*i.e.* none) negated the need for any special care to protect invitees. The converse of such an argument is equally true; *if the Attack Dog's breeds had a reputation for aggressiveness, Province should have taken that reputation into account in deciding how to maintain his gate.*  In that Exhibits B, C, and D were offered to show the common belief that German Shepherd Dogs and Boxers may be aggressive breeds, and not to actually prove the truth of such beliefs, these Exhibits should not have been stricken from the summary judgment record.

6.     However, even if this Court were to sustain the Trial Court's evidentiary ruling, the summary judgment record still contains evidence of the Attack Dog's aggressiveness.  For example, the DNA report (to which Province did *not* object) states "[t]here have been reported incidents of German Shepherd Dogs being aggressive with other pets or people." (C.R. 301; Response at Exh. A).  Likewise, the DNA report states that Boxers have a "[t]endency to jump up on people . . . ." (C.R. 302; Response at Exh. A).  The DNA report (which was produced by Province in the course of discovery) is dated April 11, 2011 – *before the Attack.  Id.*  As such, the DNA report confirms not simply that a German Shepherd Dog/Boxer mix has well-known aggressive tendencies, but that Province himself was aware of such tendencies before the Attack.

***Issue 2*** **– This Court should reverse and remand because the Trial Court erred when it granted summary judgment to Province, despite the fact that Smith offered competent summary judgment evidence (some of which Province did not oppose) indicating (a) the aggressive tendencies of the breeds (in part German Shepherd Dog and Boxer) comprising the Attack Dog, (b) that Province permitted a hole to exist in his gate, at the main point of ingress and egress to his property, (c) that Province knew the Attack Dog could stick its head through the hole, and potentially could bite anyone (including a licensee such as Smith) who came to the gate, and (d) Smith was seriously injured when the Attack Dog in fact stuck its head through the hole, and bit her in the neck.**

7. Texas adheres to the so-called "one bite" rule with respect to dog bites. *Marshall v. Ranne,* 511 S.W.2d 255 (Tex. 1974). This name is misleading. A dog owner is not free of liability the first time his or her dog attacks a person. Instead, as the court noted in *Lewis v. Great Southwestern Corporation*, 473 S.W.2d 228, 230 (Tex.Civ.App.—Fort Worth 1971, writ ref'd n.r.e.) (emphasis added), "the owner of the dog is not liable for injuries caused by it, unless it is vicious and knowledge *or constructive knowledge* of that fact is shown or brought home to the owner." In other words, if a man knows *or should know* that his best friend has vicious tendencies, that man cannot escape liability simply because his dog has not yet hurt someone. *See Rodriguez v. Haddock,* 2003 WL 1784923 at *2 (Tex.App.—Fort Worth, April 3, 2003, no pet.) (emphasis added).

8. As recently recognized in *Stein v. Reger,* 2016 Tex. App. LEXIS 5961, 2016 WL 3162589 (Tex. App.—Houston [1ˢᵗ Dist.] 2016), a dog's breed can have a direct impact on whether a homeowner is liable for an attack. In *Stein,* as in this

4

case, the plaintiff was a U.P.S. worker who was attacked by a German Shepherd. Although the defendants kept the German Shepherd in a fenced area, the dog jumped the fence and attacked the plaintiff. The defendants filed a Motion for Summary Judgment, including affidavits stating that the dog never had bitten anyone before, and had not previously attempted to jump the fence. Based in part on the defendants' statements that they "could never have anticipated that [the dog] may have been able to jump the fence," the court granted the defendants' traditional and no-evidence Motion for Summary Judgment.

9.     Even if a dog is not vicious, its owner may be liable for injuries the dog causes "if the plaintiff can prove the owner's negligent handling or keeping of the animal caused the injury." *Labaj v. VanHouten*, 322 S.W.3d 416, 420 (Tex. App.—Amarillo 2010, no pet.); *see Dunnings v. Castro*, 881 S.W.2d 559, 563 (Tex. App.—Houston [1st Dist.] 1994, writ denied) ("an owner of a dog may be liable for injuries caused by the dog even if the animal is not vicious, if the plaintiff can prove that the owner's negligent handling of the animal caused the animal to injure the plaintiff"). "Unlike strict liability claims, to prevail in a negligence action the plaintiff does not have to prove that the animal was vicious or dangerous." *Muela v. Gomez*, 343 S.W.3d 491, 496 (Tex. App.—El Paso 2011, no pet.); *see Dunnings*, 881 S.W.2d at 562 (although finding of viciousness is necessary in strict-liability claim, it is not necessary in negligence claim). To sustain such a claim, the victim of the dog bite

5

must show: "(1) the defendant was the owner or possessor of the animal; (2) the defendant owed a duty to exercise reasonable care to prevent the animal from injuring others; (3) the defendant breached that duty; and (4) the defendant's breach proximately caused the plaintiff's injury." *Labaj*, 322 S.W.3d at 420-21.

10. Although the *Stein* court found the defendant did not breach a duty to the plaintiff, its decision is instructive in this lawsuit. "The threshold inquiry in a negligence case is duty." *Muela*, 343 S.W.3d at 497. "The status of the plaintiff who was injured on the defendant's premises determines the scope of the defendant's duty." *Labaj*, 322 S.W.3d at 421. "A mailman, like Stein, is an invitee and, thus, the Regers had a duty to 'exercise ordinary care to keep [their] premises in a reasonably safe condition.'" *Id.*; *see Dunnings*, 881 S.W.2d at 563 (holding mailman is invitee in dog-bite negligence case).

11. The extent of the duty of "ordinary care" depends to a certain degree "on proof of whether the risk of injury from a dog bite is foreseeable, *i.e.*, the dog owner's actual *or constructive knowledge* of the danger presented by his dog." *Labaj*, 322 S.W.3d at 421 (emphasis added). To establish that a defendant breached its duty, the plaintiff "must present evidence showing [the defendant] did not act as a 'reasonable prudent person' would have acted in the same or similar circumstances in handling the dog":

> [The plaintiff] did not proffer evidence that the [defendants] breached any duty to [the plaintiff] by failing

to secure [the dog]. [The plaintiff] did not identify any evidence that the [defendants] did not use 'ordinary care' in securing [their dog] behind an iron-wrought fence. In response to the motions, [the plaintiff] did not present any evidence concerning the height of the fence, [the dog's] size, ***the typical height a German Shepherd can jump***, or that [the dog] had previously jumped the fence. In his brief, he makes one, conclusory statement regarding breach: that the [defendants] breached their duty by failing 'to ensure that [their dog], a large German shepherd, was properly secured in her enclosure.' This conclusory statement does not analyze how the [defendants] breached their duty or how the [defendants] should have secured [their dog] beyond doing what they had already done, that is, securing her in a fenced area.

*Stein*, 2016 Tex. App. LEXIS 5961 at p. 11 (emphasis added), citing *Allen ex rel. B.A. v. Albin*, 97 S.W.3d 655, 666 (Tex. App.—Waco 2002, no pet.).

12. Unlike the plaintiff in *Stein,* Smith has offered summary judgment evidence regarding the well-known characteristics of the dog in question. The Attack Dog is a mixed breed dog comprised primarily of German Shepherd Dog and Boxer. (C.R. 300-304; *see DNA Analysis* [Response Exh. A]). These breeds are commonly known to be aggressive and territorial. In Forbes Magazine, German Shepherds Dogs are ranked as the fourth most-dangerous breed, and are described as "a powerful dog that is loyal when well-trained *but can be fierce.*" (C.R. 306; Response Exh. B). Boxers likewise made the list at Number 8, and are described in Dogs World as "Boxers are hunting dogs and they have been used *as attack and guard dogs ever since being bred!* They have a powerful jaw and bite – *which is*

*perfect for protection!"* (C.R. 307; Response Exh. B) (emphasis added). These statements certainly are not meant to suggest that all German Shepherds Dogs and Boxers are vicious.[1] However, a responsible pet owner cannot ignore these in-bred traits when determining how to protect invitees such as Smith from these animals.

13.     With the Attack Dog's inbred characteristics in mind, a fact issue exists regarding whether Province's negligent maintenance of his gate was a cause of the Attack. The gate to Province's property has large openings through which the Attack Dog could place its head. (C.R. 358-359; *T. Province Depo* [Response Exh. F] at p. 33, l. 17 to p. 34, l. 8). Province was aware of these openings. *Id.* Province could have covered these openings with chicken wire – which he did for certain openings – but did not cover all openings *for the simple fact that he ran out of wire*. (C.R. 353-354; *T. Province Depo* [Response Exh. F] at p. 28, l. 21 to p. 29, l. 8). This allowed the Attack Dog to poke his head outside the fence, and bite Smith. Province should not be permitted to excuse his carelessness on the so-called "one bite rule," when he knew or should have known the Attack Dog might do exactly what it was bred to do, and he gave the Attack Dog the ability to do so (by knowingly leaving an open gap in the gate).

---

[1]     In the interest of candor, the undersigned counsel states that he personally owns a German Shepherd and a Pit Bull mix (the most "dangerous" breed on all three attached lists). The undersigned counsel's dogs are well-trained and well-behaved. That said, the undersigned counsel certainly would not leave a hole in his fence such that the dogs could bite at passers-by. These dogs are simply too powerful, territorial, and loyal for their owner to take that kind of a chance with someone else's life.

**8**

14.     In addition to his traditional Motion for Summary Judgment, Province sought a no-evidence summary judgment. (CR 255-257). The evidence attached to Smith's Response (including excerpts from Province's deposition transcript) establishes that Province owed a duty to protect Smith (as an invitee) from the Attack Dog's dangerous and in-bred (*i.e.* foreseeable) tendencies. This evidence also establishes that Province breached this duty by failing to cover *known* openings in the gate when he easily could have done so. Finally, this evidence establishes that Province's breach of his duty was a proximate cause of Smith's injuries. Therefore, for the same reasons that the trial should have denied the traditional Motion for Summary Judgment, it likewise should have denied the no-evidence Motion for Summary Judgment.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Appellant KAREN LINDSEY SMITH prays that this Court sustain both issues raised herein, reverse the Trial Court's summary judgment, and remand this case for trial. Appellant further prays for such other and further relief to which she is justly entitled.

Respectfully submitted,

/s/  Mark D. Johnson
PAUL FLANNIGAN
State Bar No. 24012633

**9**

paul@flanniganlawfirm.com
MARK D. JOHNSON
State Bar No. 10770175
mark@flanniganlawfirm.com

FLANNIGAN & JOHNSON, P.L.L.C.
5600 Tennyson Parkway, Suite 330
Plano, Texas 75024
Phone:  (972) 383-9377
Fax:     (844) 287-8882

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF COMPLIANCE

I certify that the word count function on Microsoft Word indicates that this brief contains 4807 words.  TEX. R. APP. P. 9.4(I)(3).

*/s/  Mark D. Johnson*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon the following party via the means indicated on March 23, 2018:

*Via E-mail and E-Service*
J. Brantley Saunders
Brantley@SaundersWalsh.com
Abigail K. Christmann
Abby@SaundersWalsh.com

/s/ Mark D. Johnson
Mark D. Johnson

# APPENDIX

FILE FOR RECORD
DENTON COUNTY CLERK

NOV 13 2017

JULI LUKE
_____ /v/v _____ DEPUTY

Cause No. CV-2016-00729

| KAREN LINDSEY SMITH, | § | IN THE COUNTY COURT |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | NO. 2 |
| | § | |
| TERRY P. PROVINCE | § | |
| Defendant. | § | DENTON COUNTY, TEXAS |

## ORDER GRANTING DEFENDANT TERRY PROVINCE'S SECOND AMENDED MOTION FOR SUMMARY JUDGMENT

CAME TO BE HEARD, Defendant Terry Province's Second Amended Motion for Summary Judgment in the above captioned matter. After reviewing the Motion, the Response, the Reply, the competent summary judgment evidence, and the Court's file, the Court finds that the Motion should be Granted.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Defendant Terry Province's Second Amended Motion for Summary Judgment is **GRANTED**. All claims made by Plaintiff against Terry Province are hereby dismissed with prejudice. Court costs of Terry Province are to be borne by Plaintiff, for which let execution issue.

SIGNED THIS __/J__ DAY OF __November__ 2017.

_____
JUDGE PRESIDING

---

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT                    PAGE 1

Cause No. CV-2016-00729

| KAREN LINDSEY SMITH, | § | IN THE COUNTY COURT |
| Plaintiff, | § | |
| | § | |
| v. | § | NO. 2 |
| | § | |
| TERRY P. PROVINCE | § | |
| Defendant. | § | DENTON COUNTY, TEXAS |

## ORDER ON DEFENDANT TERRY PROVINCE'S OBJECTIONS TO PLAINTIFF'S SUMMARY JUDGMENT EVIDENCE

CAME ON TO BE CONSIDERED, *Defendant Terry Province's Objections to Plaintiff's Summary Judgment Evidence.* After reviewing the objections and the evidence, the parties' pleadings, and hearing the argument of counsel, it is the opinion of the Court that the objections should be sustained, and the same hereby is GRANTED as indicated below. The Court rules on Defendant's objections to Exhibit B, Exhibit C and Exhibit D of *Plaintiff's Response to Defendant's Second Amended Motion for Summary Judgment* as follows:

### I.

**Objection No. 1**: Defendant objects to the use of Exhibit B, in its entirety, it is inadmissible hearsay pursuant to Texas Rule of Civil Procedure 802.

Granted ___✓___            Denied _____

The Court hereby strikes Exhibit B, in its entirety, from the record.

---

ORDER ON DEFENDANT'S OBJECTIONS TO SUMMARY JUDGMENT EVIDENCE            Page 1

**Objection No. 2**: Defendant objects to the use of Exhibit C, in its entirety, it is inadmissible hearsay pursuant to Texas Rule of Civil Procedure 802.

Granted _____✓_____          Denied _____

The Court hereby strikes Exhibit C, in its entirety, from the record.

**Objection No. 3**: Defendant objects to the use of Exhibit D, in its entirety, it is inadmissible hearsay pursuant to Texas Rule of Civil Procedure 802.

Granted _____✓_____          Denied _____

The Court hereby strikes Exhibit D, in its entirety, from the record.

_____
JUDGE PRESIDING

Filed: 10/5/2017 4:58 PM
Juli Luke
Denton County, County Clerk
By: Sandra Erp, Deputy

**Cause No. CV-2016-00729**

| | | | |
|---|---|---|---|
| **KAREN LINDSEY SMITH,** | § | **IN THE COUNTY COURT** | |
| **Plaintiff,** | § | | |
| | § | | |
| **v.** | § | **NO. 2** | |
| | § | | |
| **TERRY P. PROVINCE** | § | | |
| **Defendant.** | § | **DENTON COUNTY, TEXAS** | |

**DEFENDANT'S SECOND AMENDED MOTION FOR SUMMARY JUDGMENT**

**TO THE HONORABLE JUDGE OF SAID COURT:**

**COMES NOW** Defendant, Terry Province (hereinafter "the Defendant"), and makes, files and serves this Defendant's Second Amended Motion for Summary Judgment pursuant to Texas Rule of Civil Procedure Rule 166a, and in support thereof would respectfully show this Honorable Court the following:

**I.**
**FACTUAL BACKGROUND**

This is an unfortunate dog bite case involving the Province's family dog, Heidi; a dog that had no prior instances of biting or attacking anyone and, at the time of the incident, was inside Defendant's yard, a place she had a right to be. Plaintiff has alleged that Defendant was negligent when Plaintiff was allegedly bitten by Heidi as she placed a UPS package at the rural property, on or about January 4, 2016. See *Plaintiff's Original Petition*, pages 5-6.

A dog owner is not negligent for allowing their dog to run at large on the owner's own property. *Bushnell v. Mott*, 254 S.W.3d 451, 452 (Tex. 2008); *Searcy v. Brown*, 607 S.W.2d 937, 940-41 (Tex. Civ. App.–Houston [1st Dist.] 1980, no writ). The owner of a dog is not liable for injuries caused by it in a place it has the right to be, unless the owner knew or should have known that the dog had vicious propensities or a vicious or unruly nature. *Rodriguez v. Haddock*,

**DEFENDANT'S SECOND AMENDED MOTION FOR SUMMARY JUDGMENT          PAGE 1**

2003 WL 1784923 at \*2 (Tex. App.–Fort Worth, April 3, 2003, no pet.); *Lewis v. Great S.W. Corp.*, 473 S.W.2d 228, 230 (Tex. Civ. App.–Fort Worth 1971, writ ref'd n.r.e.).

This is Heidi (pictured next to Defendant's cat):



Heidi is a black, seven-year-old, 100 pound, mixed breed dog that Defendant acquired as a puppy and has owned the entire time since. See *Exhibit A – Affidavit of Terry Province; Exhibit D – Affidavit of Renee Province*. At the time of the incident, Heidi was approximately six years old and had lived with Defendant on the property since he got her. See *id*. Heidi had never bitten anyone, including the various delivery people that delivered packages to the property, before the incident at issue. See *id.* In fact, Heidi is normally a well-behaved dog with no vicious tendencies. See *id*. Defendant currently owns five dogs, three of which, including Heidi, are mostly outdoors. See *id*. Defendant's dogs bark whenever someone passes by the yard or approaches the gate. See *id*.

*Importantly,* at all times relevant to the incident, Heidi was contained within the fence and on property. See *Exhibit A – Affidavit of Terry Province*. Heidi had no vicious tendencies and Defendant had no reason to know that she posed a danger to anyone on the other side of the fence or gate. See *id*.

It is undisputed that on January 4, 2016, Plaintiff was working as a temporary, holiday season employee of United Parcel Service ("UPS") and was dispatched to Defendant's home in Ponder to deliver a package. See *Plaintiff's Original Petition*, page 3, para. 9. While traveling to Defendant's property, a fellow UPS employee advised Plaintiff that Defendant kept one or more dogs on his property and instructed Plaintiff to leave the package by Defendant's front gate. See *Plaintiff's Original Petition*, page 3, para. 10.

Plaintiff admits that, upon arriving at Defendant's property, she could see one or more dogs on their feet behind Defendant's fence and gate as she approached the gate on foot to deliver the package. See *Plaintiff's Responses to Defendant's Requests for Admission*, Nos. 1 and 2. Plaintiff says that, at first she noticed two dogs close behind the gate, later becoming aware of a third. See *Exhibit B – Plaintiff's Depo Excerpts*, 48:11-49:10. The third dog that Plaintiff claims appeared later was black, and is the one that allegedly bit her. See *Exhibit B – Plaintiff's Depo Excerpts*, 147:3-11. Plaintiff agrees that she didn't look specifically at the gate to Defendant's property, and wasn't paying close enough attention to the gate to notice that it had metal slats with openings in it wide enough for a dog to stick its nose through or that the dogs were close to the gate. See *Exhibit B – Plaintiff's Depo Excerpts*, 126:4-127:11.

The gate to Defendant's property is recessed approximately a foot behind the fence line on the property. See *Exhibit A – Affidavit of Terry Province*; *Exhibit C – Affidavit of Eric Zollinger*; *Exhibit C-1 – Survey*. The fence itself is at or behind the actual property line. See *id*. Photographs attached to Defendant's affidavit as Exhibit A-2, accurately depicts the fence and gate. See *Exhibit A – Affidavit of Terry Province*; *Exhibit A-2 – Photograph of Defendant's Property*.

Defendant's wife told delivery people, including UPS, to leave packages outside the gate. See *Exhibit D – Affidavit of Renee Province*. Defendant and his wife generally do not like strangers coming onto their property. See *Exhibit A – Affidavit of Terry Province; Exhibit D – Affidavit of Renee Province*. Additionally, Defendant and his wife fear that someone opening the gate and entering the property might not close and secure the gate properly when leaving, thereby making it possible for their dogs to escape their property. See *id*. None of Defendant's dogs has ever attacked, chewed, or in any way damaged a package or piece of mail left at their property. See *id*. The package that Plaintiff delivered on the date of the incident contained printer ink. See *Exhibit D – Affidavit of Renee Province*.

## II.
## SUMMARY OF ARGUMENT

Defendant is entitled to summary judgment on Plaintiff's claims for negligence because:

1.      Heidi was within her fenced in yard, a place she had a right to be. She had no dangerous tendencies and, therefore, Defendant was certainly not aware of dangerous propensities or vicious tendencies. Because Heidi biting Plaintiff was not foreseeable, Defendant cannot be liable. Defendant's summary judgment evidence affirmatively disproves that Defendant owed or breached any duty allegedly owed to Plaintiff or that Defendant was the proximate cause of Plaintiff's injuries. Defendant acted as a reasonable prudent person under the circumstances and, therefore, is not liable to Plaintiff for her injuries. Alternatively, Plaintiff cannot produce sufficient evidence on these issues to create a fact issue, as no such evidence exists.

2.      As "the existence of negligent conduct is a prerequisite to the establishment of gross negligence," Defendant cannot be found to have been grossly negligent

because he did not act negligently at all. <u>See</u> *In re J.H. Walker, Inc.*, 2016 Tex. App. LEXIS 483 (App.—Dallas Jan. 15, 2016). Further, Defendant did not consciously disregard any extreme risk with regard to Plaintiff and, therefore, was not grossly negligent.

3.    Plaintiff has insufficient or no evidence to establish that Defendant knew or should have known that Heidi had any dangerous propensities or that the incident was foreseeable. Therefore, Plaintiff has insufficient or no evidence that Defendant owed or breached any duty allegedly owed to Plaintiff or that Defendant's alleged breach caused the damages of which Plaintiff complains.

Therefore, Summary Judgment is requested as to all of Plaintiffs' claims.

### III.
### <u>SUMMARY JUDGMENT EVIDENCE</u>

In support of the Motion for Summary Judgment, Defendant relies on all pleadings and discovery produced in this case, including but not limited to the following Exhibits which are attached hereto and fully incorporated herein by this specific reference:

**Exhibit A:**    Affidavit of Terry Province
**Exhibit A-1:**  Photograph of Heidi
**Exhibit A-2:**  Photograph of Defendant's Property
**Exhibit B:**    Plaintiff Karen Lindsey Smith's Deposition Excerpts
**Exhibit C:**    Affidavit of Eric Zollinger
**Exhibit C-1:**  Survey of Defendant's Property
**Exhibit D:**    Affidavit of Renee Province

### IV.
### <u>TRADITIONAL MOTION FOR SUMMARY JUDGMENT STANDARD</u>

A defendant is entitled to summary judgment on a plaintiff's cause of action if the defendant can disprove at least one element of the plaintiff's cause of action as a matter of law. *Henkel v. Norman*, 441 S.W.3d 249, 251 (Tex. 2014); *Boerjan v. Rodriguez*, 436 S.W.3d 307,

310 (Tex. 2014); *Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013); *Randall's Food Mkts, Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995); *see* Tex. R. Civ. P. 166a(c). Once a defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to a plaintiff to come forward with competent controverting evidence raising a genuine issue of material fact with regard to the element challenged by a defendant. *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). A defendant is entitled to summary judgment on an affirmative defense if the defendant conclusively proves all the elements of the affirmative defense. *Rhone-Poulenc, Inc. v. Ramirez*, 997 S.W.2d 217, 223 (Tex. 1999). The defendant must present summary judgment evidence that establishes each element of the affirmative defense as a matter of law. *Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 121 (Tex. 1996).

## V.
## TRADITIONAL MOTION FOR SUMMARY JUDGMENT FOR PLAINTIFF'S CLAIMS

In order to prove that Defendant was negligent, Plaintiff must prove:

1. Defendant was the owner or the possessor of the animal;
2. Defendant owed a duty to exercise reasonable care to prevent the animal from injuring others;
3. Defendant breached that duty; and
4. Defendant's breach proximately caused Plaintiff's injury

*Labaj v. VanHouten*, 322 S.W.3d 416, 420-21 (Tex. App.–Amarillo 2010, no pet.); *Thompson v. Curtis*, 127 S.W.3d 446, 451 (Tex. App.–Dallas 2004, no pet.); *Allen ex rel. B.A. v. Albin*, 97 S.W.3d 655, 660 (Tex. App.–Waco 2002, no pet.).

Defendant's summary judgment evidence disproves that Defendant breached a duty to Plaintiff or that any alleged breach by Defendant was the proximate cause of Plaintiff's injury. And, because "the existence of negligent conduct is a prerequisite to the establishment of gross negligence," Plaintiff cannot establish that Defendant was grossly negligent. See *In re J.H. Walker, Inc.*, 2016 Tex. App. LEXIS 483 (App.—Dallas Jan. 15, 2016). Defendant's summary

judgment evidence further affirmatively disproves that Defendant consciously disregarded an extreme risk by leaving Heidi outside, enclosed within his property.

**A.** **Heidi was on Defendant's Property at the Time of the Incident; Defendant Did Not Know that Heidi had Vicious Propensities or a Vicious or Unruly Nature.**

In Texas, absent some showing that the dog was a "dangerous dog," a dog owner is not liable for simply allowing his dogs to be contained within his fenced-in yard. See *Bushnell v. Mott*, 254 S.W.3d 451, 452 (Tex. 2008); *Searcy v. Brown*, 607 S.W.2d 937, 940-41 (Tex. Civ. App.–Houston [1st Dist.] 1980, no writ). Furthermore, the owner of a dog is not liable for injuries caused by it in a place it has the right to be, unless the owner knew or should have known that the dog had vicious propensities or a vicious or unruly nature. *Rodriguez v. Haddock*, 2003 WL 1784923 at *2 (Tex. App.–Fort Worth, April 3, 2003, no pet.); *Lewis v. Great S.W. Corp.*, 473 S.W.2d 228, 230 (Tex. Civ. App.–Fort Worth 1971, writ ref'd n.r.e.).

The facts and controlling case law in this case are clear, and reasonable minds could not differ in applying them, so summary judgment in Defendant's favor, the equivalent of an instructed verdict at trial, is proper. At the time of the incident, Heidi was enclosed within a fence on Defendant's property, a place she has a right to be. See *Exhibit A – Affidavit of Terry Province*; *Exhibit C – Affidavit of Eric Zollinger*; *Exhibit C-1 – Survey*. Heidi had never bitten anyone before the incident at issue in this case, so Defendant neither knew nor should have known the dog was vicious or unruly. See *Exhibit A – Affidavit of Terry Province*. In fact, Heidi was neither vicious nor unruly, but professionally-trained and normally well-behaved. See *id*.

As Defendant's summary judgment evidence affirmatively shows, Heidi was, at all relevant times, enclosed within Defendant's property, in a place she had a right to be. Heidi is not vicious and Defendant did not know that Heidi would bite anyone as she had never bitten anyone in the approximately six years he owned her prior to the incident. Defendant cannot be

held liable for Plaintiff's injuries under these circumstances. And, although Plaintiff has not plead premises liability, Defendant's lack of knowledge of any dangerous propensities by Heidi also precludes liability on a premises liability theory. See *Keetch v. Kroger Co.*, 845 S.W.2d 262, 264 (Tex. 1992) (elements of premises liability). Therefore, Defendant requests that this court grant its Motion for Summary Judgment as to all of Plaintiff's claims.

## B.      Defendant Did Not Owe Any Duty to Plaintiff.

In dog bite cases, the existence of a duty "depends to some degree on proof of whether the risk of injury from a dog bite is foreseeable, i.e., the dog owner's actual or constructive knowledge of the danger presented by his dog." *Labaj*, 322 S.W.3d at 421. In other words, Defendant "should not be held responsible for the consequences of an act that cannot be reasonably foreseen." *Id.*

This incident, however, was not foreseeable. Defendant did not know that allowing his dogs, including Heidi, to be on his property within an enclosed fence presented any danger. It was certainly not foreseeable that Heidi would attempt to bite someone on the other side of the fence as Defendant was not aware that Heidi had any vicious propensities or tendencies. See *Exhibit A – Affidavit of Terry Province*. To the contrary, Heidi had never bitten anyone prior to this incident and was normally a well-behaved dog. See *id*. The risk Heidi would bite someone on the other side of the fence or gate while secured within Defendant's yard was not foreseeable and, therefore, Defendant did not owe any duty to Plaintiff. To impose a duty on every owner of a non-vicious dog to tie up the dog on the owner's own fenced-in property or to install chicken wire over the whole fence surrounding his property to protect passersby is not and should not be the public policy of the State of Texas.

**C.      Defendant Did Not Breach Any Duty Allegedly Owed to Plaintiff.**

A dog owner only has a general duty to exercise reasonable care to avoid foreseeable injury to others. See *Kehler v. Eudaly*, 933 S.W.2d 321, 330 (Tex. App.—Fort Worth 1996, writ denied). Therefore, Defendant is simply required to act as a "reasonable prudent person" would "under same or similar circumstances regarding any reasonably foreseeable risk." *Allen v. Albin*, 97 S.W.3d 655, 666 (Tex. App—Waco 2002) (citing *Colin v. Red Steel Co.*, 682 S.W.2d 243, 245 (Tex. 1984)).

As has already been established, this incident was not foreseeable. Defendant was not aware that allowing his dogs, including Heidi, to be on his property within an enclosed fence presented any danger. It was certainly not foreseeable that Heidi would attempt to bite someone on the other side of the fence or gate as Defendant was not aware that Heidi had any vicious propensities or tendencies. See *Exhibit A – Affidavit of Terry Province*. To the contrary, Heidi had never bitten anyone prior to this incident and was normally a well-behaved dog. See *id*. The risk Heidi would bite someone on the other side of the fence or gate while secured within Defendant's yard was not foreseeable and, therefore, Defendant did not breach any duty allegedly owed to Plaintiff.

By keeping his dogs, including Heidi, enclosed within his property, Defendant acted as a reasonably prudent person would have under the same or similar circumstances. Because Defendant could not have foreseen that Heidi would bite someone on the other side of the fence, Defendant should not be held responsible for Plaintiff's injuries and, therefore, summary judgment is requested and proper on all of Plaintiff's claims.

**D.     Defendant's Actions or Inactions Did Not Cause Plaintiff's Injuries.**

Proximate cause requires that two elements be present: (1) cause in fact, and (2) foreseeability. *Western Invs. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005); *IHS Cedars Treatment Ctr. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004); *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002). The test for cause-in-fact is whether the negligent act or omission was a substantial factor in bringing about injury and whether the injury would have occurred without the act or omission. *Del Lago Partners v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010); *Western Invs.*, 162 S.W.3d at 551; *IHS Cedars Treatment Ctr.*, 143 S.W.3d at 799. There is no cause-in-fact when the defendant's negligence did nothing more than furnish a condition that made the injury possible. *IHS Cedars Treatment Ctr.*, 143 S.W.3d at 799. To prove foreseeability, Plaintiff must establish that a person of ordinary intelligence should have anticipated the danger created by the negligent act or omission. *Doe v. Boys Clubs*, 907 S.W.2d 472, 478 (Tex. 1995).

Defendant was not the proximate cause of Plaintiff's injuries. As has been established, Defendant could not have foreseen that anyone on the outside of the fence or gate, including Plaintiff, would have been bitten by Heidi. Defendant was not aware that Heidi had any vicious propensities or dangerous tendencies. <u>See</u> *Exhibit A – Affidavit of Terry Province*. To the contrary, Heidi had never bitten anyone prior to this incident and was normally a well-behaved dog. <u>See</u> *id*. Defendant could not have anticipated that leaving the dogs, including Heidi, enclosed on his property by a fence would have created any danger to those on the other side of the fence.

Defendant's summary judgment evidence affirmatively disproves that Defendant was the proximate cause of Plaintiff's injuries. As a result, Defendant requests that this Court grant this Motion for Summary Judgment as to Plaintiff's claims against Defendant.

**E. Defendant Did Not Consciously Disregard Any Extreme Risk.**

Gross negligence is an act or omission that, when viewed objectively from the standpoint of the actor at the time of its occurrence, involves an extreme degree of risk, and of which the actor has actual, subjective awareness of the risk involved but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others. See TEX. CIV. PRAC. & REM. CODE § 41.001(11); *U-Haul Int'l v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012); *Columbia Med. Ctr. v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2008); *Fairfield Ins. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 657 (Tex. 2008); *Coastal Transp. Co. v. Crown Cent. Pet. Corp.*, 136 S.W.3d 227, 231 (Tex. 2004).

To establish gross negligence, "the act or omission complained of must depart from the ordinary standard of care to such an extent that it creates an extreme degree of risk of harming others." *Hogue*, 271 S.W.3d at 248. An extreme degree of risk is more than a remote possibility of injury or even a high probability of minor harm; it is the likelihood of serious injury to the plaintiff. See *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998). To prove that a defendant had actual, subjective awareness of the risk but proceeded with conscious indifference, the plaintiff must show the defendant knew of the risk but acted anyway. See *id*. This conscious indifference refers to the rights, safety, or welfare of others. See *id*.

Here, Defendant was not aware of any risk associated with allowing his dogs, including Heidi, to roam Defendant's property within an enclosed fence. As has been established, Defendant did not know that Heidi had any vicious propensities or tendencies. See *Exhibit A – Affidavit of Terry Province*. To the contrary, Heidi had never bitten anyone prior to this incident and was normally well-behaved. See *id*. Furthermore, Defendant did not act with conscious indifference to anyone's rights, safety or welfare, including Plaintiff. Defendant kept his dogs,

including Heidi, contained in a fence surrounding his property. See *id*. Defendant did not depart from the ordinary standard of care by keeping his pet dogs, including Heidi, enclosed in a fence on his property.

Because Defendant was unaware of any risks involved in leaving Heidi inside his fenced-in yard and did not act with conscious disregard of any alleged risk, Defendant simply could not have anticipated that anyone, including Plaintiff, would have been bitten by Heidi from behind the fence or gate. Therefore, Defendant was not grossly negligent.

Defendant's summary judgment evidence affirmatively disproves that Defendant was negligent or grossly negligent under these circumstances. Therefore, Defendant requests the Court grant this Motion for Summary Judgment as to all of Plaintiff's claims against Defendant.

## VI.
## NO-EVIDENCE MOTION FOR SUMMARY JUDGMENT STANDARD

A court may grant a no-evidence motion for summary judgment if the movant can show that adequate time for discovery has passed and the non-movant has no evidence to support one or more essential elements of its claim or defense. Tex. R. Civ. P. 166a(i); see *Boerjan v. Rodriguez*, 436 S.W.3d 307, 310 (Tex. 2014); *Fort Brown Villas III Condo. Ass'n v. Gillenwater*, 285 S.W.3d 879, 882 (Tex. 2009). To determine whether an adequate time for discovery has passed, "courts consider the following nonexclusive factors: (1) the nature of the suit, (2) the evidence necessary to controvert the motion, (3) the length of time the case has been on file, (4) the length of time the motion has been on file, (5) the amount of discovery that has already taken place, (6) whether the movant requested stricter deadlines for discovery, and (7) whether the discovery deadlines in place were specific or vague." *Cmty. Initiatives, Inc. v. Chase Bank*, 153 S.W.3d 270, 278 (Tex. App.—El Paso 2004, no pet.); see *McInnis v. Mallia*, 261 S.W.3d 197, 201 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

Under Texas Rule of Civil Procedure 166a(i), when a party files a no-evidence motion for summary judgment, the burden shifts to the non-moving party to present evidence raising an issue of material fact as to the elements specified in the motion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). "A no evidence point will be sustained when (a) there is a complete lack of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is not more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact." *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003).

In order to defeat this no-evidence motion for summary judgment, Plaintiffs must bring forth more than a scintilla of probative evidence to raise a genuine issue of material fact. Tex. R. Civ. P. 166a(i); *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002); *see Boerjan*, 436 S.W.3d at 312; *Forbes, Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 172 (Tex. 2003). The evidence must be sufficient to "allow reasonable and fair-minded people to differ in their conclusions" on whether the challenged fact exists; evidence that raises only a speculation or surmise is insufficient. *Forbes, Inc.*, 124 S.W.3d at 172. If less than a scintilla of evidence is produced, the defendant is entitled to a summary judgment on the plaintiff's cause of action.

Pursuant to Rule 166a(i) of the Texas Rules of Civil Procedure, Defendant would show that this case has been on file since March 30, 2016, and more than an adequate time for discovery has passed, but that Plaintiff has failed to produce evidence on one or more of the essential elements of her claims.

## VII.
## <u>NO-EVIDENCE MOTION FOR SUMMARY JUDGMENT FOR PLAINTIFF'S CLAIMS</u>

In order to prove that Defendant was negligent, Plaintiff must prove:

1. Defendant was the owner or the possessor of the animal;
2. Defendant owed a duty to exercise reasonable care to prevent the animal from injuring others;
3. Defendant breached that duty; and
4. Defendant's breach proximately caused Plaintiff's injury

*Labaj v. VanHouten*, 322 S.W.3d 416, 420-21 (Tex. App.–Amarillo 2010, no pet.); *Thompson v. Curtis*, 127 S.W.3d 446, 451 (Tex. App.–Dallas 2004, no pet.); *Allen ex rel. B.A. v. Albin*, 97 S.W.3d 655, 660 (Tex. App.–Waco 2002, no pet.).

The owner of a dog is not liable for injuries caused by it in a place it has the right to be, unless the owner knew or should have known that the dog had vicious propensities or a vicious or unruly nature. *Rodriguez v. Haddock*, 2003 WL 1784923 at *2 (Tex. App.–Fort Worth, April 3, 2003, no pet.); *Lewis v. Great S.W. Corp.*, 473 S.W.2d 228, 230 (Tex. Civ. App.–Fort Worth 1971, writ ref'd n.r.e.). Plaintiff has insufficient or no evidence to establish that the dog was in a place that it did not have the right to be at the time of the accident. Plaintiff has insufficient or no evidence that Defendant knew or should have known that the dog had vicious propensities or a vicious or unruly nature.

Because Plaintiff cannot present sufficient evidence as to these elements, Defendant cannot be held liable for her injuries. Furthermore, because Plaintiff has no evidence that Defendant was negligent, Defendant cannot be found to have been grossly negligent. See *In re J.H. Walker, Inc.*, 2016 Tex. App. LEXIS 483 (App.—Dallas Jan. 15, 2016). Further, Plaintiff has insufficient or no evidence that Defendant consciously disregarded an extreme degree of risk with regard to the incident. And, although Plaintiff has not plead premises liability, Defendant's lack of knowledge of any dangerous propensities by Heidi also precludes liability on a premises liability theory. See *Keetch v. Kroger Co.*, 845 S.W.2d 262, 264 (Tex. 1992) (elements of premises liability).

Plaintiff presents insufficient or no evidence that Defendant owed Plaintiff any duty, insufficient or no evidence that Defendant breached a duty owed to the Plaintiff (if any), and insufficient or no evidence that Defendant's actions or inactions proximately caused the Plaintiff's injuries. There is therefore insufficient or no evidence tending to prove the breach of duty or proximate cause elements of Plaintiff's negligence and gross negligence causes of action. Because Plaintiff cannot meet her burden on either of these elements, this motion must be granted. Tex. R. Civ. P. 166a(i). On this basis, Defendant requests the Court grant summary judgment in favor of Defendant pursuant to Texas Rule of Civil Procedure 166a(i) as adequate time for discovery has passed.

## VIII.
## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Defendant Terry P. Province respectfully requests that this Court grant his Motion for Summary Judgment against Plaintiff's claims of negligence, gross negligence, and any other cause of action. Defendant further prays for all such other and further relief, both general and special, in law and in equity, including costs and attorney's fees, to which he has proved himself to be justly entitled.

Respectfully submitted,

*Abigail K. Christmann*

J. Brantley Saunders
State Bar No. 17681500
Abigail K. Christmann
State Bar No. 24097523

SAUNDERS, WALSH & BEARD
Craig Ranch Professional Plaza
6850 TPC Drive, Suite 210
McKinney, Texas 75070

(214) 919-3555 Telephone
(214) 615-9019 Telecopier
Brantley@SaundersWalsh.com
Abby@SaundersWalsh.com
**ATTORNEYS FOR DEFENDANT**

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that a true and correct copy of the foregoing document, **Defendant's Second Amended Motion for Summary Judgment**, was served upon all counsel of record on this the 5th day of October 2017, pursuant to Texas Rules of Civil Procedure 21 and 21a.

Paul Flannigan
paul@flanniganlawfirm.com
Mark D. Johnson
mark@flanniganlawfirm.com
Nick Tedford
nick@flanniganlawfirm.com
FLANNIGAN LAW FIRM, P.L.L.C.
3350 Parkwood Boulevard, Suite A201
Frisco, Texas 75034
Phone: (972) 383-9377
Fax: (844) 287-8882
**ATTORNEYS FOR PLAINTIFF**

*Abigail K. Christmann*

## Cause No. CV-2016-00729

| | | |
|---|---|---|
| KAREN LINDSEY SMITH, | § | IN THE COUNTY COURT |
| Plaintiff, | § | |
| | § | |
| v. | § | NO. 2 |
| | § | |
| TERRY P. PROVINCE | § | |
| Defendant. | § | DENTON COUNTY, TEXAS |

## <u>AFFIDAVIT OF TERRY PROVINCE</u>

STATE OF TEXAS §
§
COUNTY OF _Denton_ §

BEFORE ME, the undersigned notary, on this day personally appeared Terry Province, a person whose identity is known to me. After I administered an oath to affiant, affiant testified:

"My name is Terry Province. I am the Defendant in this suit. I am over the age of 18 years, competent in all respects to make this affidavit, have personal knowledge of the facts stated herein, and everything stated herein is true and correct.

The dog that Plaintiff has identified as the "black dog" that bit her is named "Heidi." Heidi is now seven years old, weighs approximately 100 pounds, and is a mixed breed. At the time of the incident, Heidi was six years old. Attached hereto as **Exhibit A-1** is a photograph of Heidi lying beside one of our cats. Attached hereto as **Exhibit A-2** is a photograph that accurately depicts the fence and gate on my property on the day of the incident at issue. Both of these photos are true and accurate depictions of what they purport to show as stated above.

The gate to my property is recessed about a foot behind the fence line. The fence immediately surrounding the gate is at, or behind, the actual property line. The location of the gate and the portions of the fence surrounding the gate has been confirmed by a professional surveyor, Eric M. Zollinger, to be wholly on my property. Based upon the Plaintiff's description of the incident, Heidi was within a place that she had a right to be on my property at the time of the incident.

Heidi has no vicious tendencies and had never bitten anyone before the incident at issue.

I acquired Heidi when she was just a puppy, about eight weeks old. I have owned Heidi the entire time since then. Heidi is normally a well-behaved dog, having received formal training from a commercial dog trainer that made her obedient to the following commands: come, sit, down, place, stay, off, quiet, and release. My wife, Renee, and I currently own five dogs, three of which, including Heidi, are mostly outdoors. The dogs are kept within our fenced-in yard. The dogs run along the fence and bark whenever someone passes by the yard or approaches the gate.

---

AFFIDAVIT OF TERRY PROVINCE                                                                 PAGE 1

I was not present on my property when the incident at issue occurred. My wife and I were away together running errands. When my wife and I returned home, all of the dogs were still contained within the fence on our property.

My wife, Renee, and I preferred for delivery people to leave packages outside the gate to our property. We do not like strangers coming onto our property. We also fear that someone opening the gate and entering our property might not close and secure the gate properly when leaving, thereby making it possible for our dogs to escape our property. None of our dogs has ever attacked, chewed, or in any way damaged a package or piece of mail left at our property.

The information contained in this affidavit is true and correct and based on my personal knowledge."

FURTHER AFFIANT SAYETH NOT.

_____
Terry Province

SWORN TO AND SUBSCRIBED TO before me, the undersigned authority, by the said Terry Province on the 28th day of September, 2017.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

DEVIN ERICKSON
Notary Public
State of Texas
ID # 13105328-7
My Comm. Expires 03-22-2021

---

AFFIDAVIT OF TERRY PROVINCE                                    PAGE 2





Page 1

NO. CV-2016-00729

KAREN LINDSEY SMITH,          ) IN THE COUNTY COURT
                              )
          Plaintiff,          )
                              )
VS.                           ) DENTON COUNTY, TEXAS
                              )
TERRY P PROVINCE,             )
                              )
          Defendant.          ) AT LAW NO. 2

_____

ORAL DEPOSITION OF

KAREN LINDSEY SMITH

AUGUST 26, 2016

VOLUME 1

_____

ORAL DEPOSITION OF KAREN LINDSEY SMITH, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on August 26, 2016, from 12:27 p.m. to 3:50 p.m., before Elizabeth Goodenough, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Flannigan Law Firm, 3550 Parkwood Boulevard, Suite S201, Frisco, Texas, pursuant to the Texas Rules of Civil Procedure.

Page 5

PROCEEDINGS

THE REPORTER: Agreements on the record?

MR. HANSEN: I'm going to let you be the custodian, because I don't need it to bulk up my file. If you'll let me know within 30 days of any changes, sending me the signature and the correction page if there are any changes --

MR. TEDFORD: Sure.

MR. HANSEN: -- that will relieve the court reporter of any other responsibility. Otherwise, under the Rules. Okay?

MR. TEDFORD: That's correct.

KAREN LINDSEY SMITH, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. HANSEN:

Q. What is your name?

A. Karen Lindsey Smith.

Q. Ms. Smith, I'm Mark Hansen. I represent Mr. Province. If I ask you a question today that you don't understand, will you be sure to make me repeat it or rephrase it until you do understand it?

A. Yes.

Q. Make sure you answer out loud for our court reporter. Don't nod your head up and down or shake it

Page 6

side to side. Don't say uh-huh or huh-uh because after this is typed up, we won't know whether that's a yes or a no. ●kay?

A. Okay.

Q. Try not to cut me off before I'm done asking you one of my questions. Sometimes I'll get started, you'll think you know where I'm headed and you answer, but then when I get to the end of the question, it was something other than you thought it was going to be.

So if you'll just be sure that I'm done talking before you talk, we'll have a clear record. Okay?

A. Okay.

Q. If you need to take a break at any time during your deposition, just let us know. We'll stop, you can go out of the room and do whatever you need to do. Okay?

A. All right.

Q. You understand your testimony today is just the same as if we were sitting in the courtroom with the judge and the jury present?

A. Uh-huh.

Q. Yes?

A. Yes, sir.

Q. Okay. Are you on any medication today that

Page 7

would prevent you from giving truthful answers to my questions?

A. No, sir.

Q. Are you on any kind of medication today?

A. None.

Q. When is the last time you took any medication because of the incident we're here about?

A. Over three to four months ago.

Q. Do you remember what you took?

A. It was just the scar cream that would go on the outside. So nothing internal. The only internal like medication was pain reliever and that was the week after the event.

Q. You stopped taking pain medication a week after the dog bite?

A. Correct.

Q. And you haven't had to take any pain medication, over the counter or prescription, after that one week?

A. What was -- I'm trying to think, these little tablets, what they're called. They were the metabolic ones that would help, but I had an allergic reaction to them so I had to stop taking them.

Q. Let me ask my question again. As far as pain medication --

Page 8

A. Yes, as far as pain medication, a week after the event I haven't taken any like Ibuprofen or hydrocodeine [sic] or anything like that.

Q. Let me get my question out. For one week after the incident, you took pain medication?

A. Yes, for two or three days after.

Q. For only two or three days?

A. Uh-huh.

Q. Yes?

A. I mean, not the whole week. Like I took the higher prescribed like hydrocodeine because it still hurt from those stitches for the first two or three days, and then just Ibuprofen after. Because I didn't want to stay on the high pain meds as long as I could. That was not the goal.

Q. Let me see if I understand your answer. For two or three days after the bite, you took prescription hydrocodone?

A. Or pain meds, yes.

Q. Or some other kind of prescription --

A. Yes.

Q. -- pain medication --

A. And then over-the-counter from then on out.

Q. Let me finish my question before you answer.

A. Okay.

Page 45

around when we would meet up. So at 9:30 or so he would pick me up from the church.

Q. Which church?

A. First Baptist Church of Ponder. So it's on 156 and 2449.

Q. And is that sometimes abbreviated FBC Ponder?

A. Yes, correct. So that was the meeting location where I'd park my car and he would pull up in his truck and then we would take off from there to run the route for the day.

Q. Is that what you think happened the day of the incident?

A. Correct.

Q. So you met Brandon at the parking lot of the First Baptist Church. Did you have a uniform on?

A. Yes. I would put it on whenever I left the house, pack my lunch and then drive to the church. Or sometimes, I think like maybe for a week, he would pick me up from my house. But that day, we had met at the location. Because sometimes if he was passing by, he would just grab me. That way I didn't have to waste money on gas to drive up to the church.

But that date I had drove to the parking lot because I think my dad had to go back and get my car later that day.

Page 46

Q. All right. Well, what happened after you met Brandon in the parking lot at the church?

A. Usually he would check his little device that told him all the addresses and places that he had to run packages for the day and he would start off on the route. Usually, we would head down back towards 2449 and clear that side of the railroad tracks and then move out to the countryside. That's just the way that he liked to run things in sequence.

Q. Do you have any reason to think the day of our incident he did something different?

A. Nope. Just normal places that would go on route. That's just how it happened to be.

Q. How many deliveries would you think you made between 9:30 and when the incident happened?

A. I mean, whatever we could fit in within an hour to an hour and a half. The incident didn't happen until like, what, 10:30 or 11:00? So whenever we started at like 9:30, about an hour's worth of stops. It just varies on how many houses we hit within that time frame.

Q. Do you have any recollection of how many deliveries you made the day of our incident before the incident happened?

A. Nope, not without looking at a record. I mean, I could take a guess but I'm not sure how accurate that

Page 47

would be.

Q. What record would you look at?

A. Whatever his little device would be. That would have to be UPS themselves or Brandon. They would have to look back through and get an accurate count.

Q. You don't have that record yourself?

A. No, sir.

Q. All right. So now we're up to you're approaching the Provinces' property?

A. Correct.

Q. All right. Tell me what happened.

A. Province, is that their last name?

Q. You don't know the last names of the people you are suing?

A. I had heard it once. It's -- I don't recollect it now.

Q. Okay. My client's name is Terry Province.

A. Okay. I've only heard it once before, just so we're clear. Maybe twice.

Q. Tell me what you recall happening as you approached the Provinces' property.

A. So we drove up to where my door was facing like the house or property and then we stopped. Brandon went to the back to get the package. Sometimes he would have them already on the dashboard, but that time he hadn't,

Page 48

so he had to go back. He came forward and scanned it while I just sat there and waited until he would hand it off to me.

As we were driving up, he just said, you know, don't go into the property. Just set it on the outside of the gate. Point case blank. So he just basically said set it by the gate and then come back. So he drove up, went back and got the package, scanned it, came forward, handed it to me. I jumped out and walked towards the gate.

I was aware of two dogs that were close to the gate. This was only like the second time that we had ever delivered to this house out of the whole entire like winter break. The other -- first time that we had ever visited that house, Brandon made the stop because it was my first week, I think. So he was kind of just wanting to do as much as he could in places that he may not have been as comfortable with me going up to or not knowing how to approach it. So this was like the second time we delivered there.

Anyway, so he said basically, here's the package. Just set it on the outside of the gate. So I made my way up with like a light jog to the gate. It wasn't that far off. Like less than 50 yards. It was pretty close. We were right on the road. It was a

12 (Pages 45 to 48)

Page 49

short little driveway to the gate.

I was aware out of like peripheral vision, two dogs that were there. I saw like a tall pole by the gate like fence post. Set it down without having to be too close but still like enough to where it was kind of out of reach, I guess you could say, and then got up to turn around. And as I did, I felt something come through. And it was like, whoa, okay, there's something like out of the corner of my eye, like I still see those two dogs, but now there is a third one in view.

Like, ouch, something is grabbing onto me. Like here's the gate up here, but yet it's reaching through. Okay, like I've got to get it off of me. So like I pushed up and just kind of like turned around and like walked back kind of like stunned, I guess was a good word, or like in shock like, okay, what just happened?

I knew what I was doing. I was going up to the gate to put down a package and yet there's something that I had not accounted for that kind of took me by surprise.

So I got back to the van or the bus, whatever you call it, and was like reaching up towards my face and felt pain. I'm like okay, there's some blood. I was like, ouch. Okay. Brandon, something's

Page 50

up. So he came out and looked at me. He's like, yeah, here, apply pressure. So he just took my hand and pushed it up. He's like, okay, sit down now.

And he closed the door and he pulled out his phone while we're still parked there and as I'm just sitting there, he's like, okay, don't stop applying pressure. Just sit there and don't remove your hands. Just sit still. Nothing major. Just calm down. You'll be fine. Okay. So I just waited while he called it in to his boss because he couldn't be calling and driving at the same time. He communicated that very clearly. So he did what he was supposed to.

Do you want me to keep continuing?

Q. Let's stop there and let me ask you another question. What did Brandon tell you to do when you arrived at the Provinces?

A. The second time, he basically just said go up to the gate and set it on the outside. He had an emphasis on don't go inside. I think in the past when we were driving by the first time, he had mentioned that the dogs might have been like a little bit rowdy and could tear packages. So he just said, you know, basically don't go into the gate. Just leave it on the outside.

That the owners had always wanted it

Page 51

like -- sometimes people left a preference on where they want packages delivered. So this one was to be delivered on the outside of the gate.

Q. Did Brandon tell you specifically to lean the package up against the gate post?

A. He just said, set it by the gate. He didn't specify lean it up against the gate or don't. Just leave it by the gate.

Q. He just told you to set it by the gate?

A. Or at the gate. By at -- I mean, I'm not going to be picky on word selection. That was like eight months ago. He just, said, go up to the gate and set the package down.

Q. So he did not tell you specifically to lean it up against the gate post?

A. He basically said just don't cross the gate. You can set it up anywhere by the gate, you can go up to it, just don't go over the gate and into their property. There was no specification on leaning up against it, don't. He said the gate was fair territory, basically. Set it at the gate.

Q. It was your decision to actually place the package up against the gate post or the fence post?

A. In training --

MR. TEDFORD: Objection. Form.

Page 52

A. In training, they would tell you to put it as close to the gate as possible because, A, if someone else comes along, they would mess with it or if the wind would blow it over. So the goal in training or orientation is always to put the package as close as possible. But I myself did not put myself like at the gate. My arms are reaching out to set it down.

So if it's leaning against it or not, I don't remember or recall. It might have been. That's what the videotape I guess will be helpful for now at this point to tell where it was at.

Q. (BY MR. HANSEN)  You don't recall whether you actually leaned the package up against the gate post or not?

A. I might have set it -- I might have like gently tossed it and just wherever I was, I set it down. I'm not sure on the specifications.

Q. As you sit here today, you do not know if you specifically leaned the package up against the gate post?

A. Not as what I recall. I set it down. I might have leaned it. I got it as close I guess as possible within what felt safe.

Q. You did not just lay it on the ground outside the gate?

Page 125

Q. Have you been back to the Provinces' property since the incident?

A. Not besides just driving by like on a daily -- like if I have to go by there. Like I have a friend that lives kind of back in that area. So like to go to Teresa's house, one time I drove by it.

Q. Who is Teresa?

A. Teresa Scofield. She's just another home-schooling friend that I have that lives in Ponder. So her house is just kind of along the way of the route.

Q. So you have been by the Provinces' house since the day of the incident?

A. Once, yeah. And then bike riding, sometimes my bike route goes back that way.

Q. Have you ridden by the Provinces' property on your bicycle?

A. Like once, but never stopped so it would be like, oh, look, like that's what's going on.

Q. Okay. So since then, you have been able to see that there is a metal --

A. I haven't stopped and looked at it.

Q. -- ranch gate on the front of their property, correct?

MR. TEDFORD: Objection. Form.

A. I haven't stopped to look at it purposeful.

Page 126

Like I just go to finish my workout or to visit my friend.

Q. (BY MR. HANSEN) You have never noticed since?

A. Besides the picture, like staring at it in depth, I mean, I know there's metal slats now but I wasn't aware at the time or when I went by to visit. It is not within my area. I don't have any interest to know.

Q. Because you just weren't paying close enough attention to it at the time of the incident?

MR. TEDFORD: Objection. Form.

A. I would say that's a fair assumption. I didn't have a reason to pay attention or look at it until now.

Q. (BY MR. HANSEN) Request for Admission Number 5 asked you to admit that, quote, as you approached it, you could see that the openings between the metal slats in the gate were wide enough for a dog to stick its nose through, end quote. Why did you deny that one?

A. I didn't even know that -- I mean, there were two dogs I was aware of. I didn't know there was a third. I didn't even know what the gate looked like much less that there was a gate there. So I didn't stop and examine if there were holes or not.

So if I didn't know what the gate slots looked like, then I wouldn't know if a dog's head could

Page 127

fit through or not fit through it.

Q. Request for Admission Number 7 asked you to admit that, quote, all three of defendant's dogs were close to the gate when you leaned down to place the package by it, end quote. You denied that. Why?

A. Because I was only aware of two dogs that were just like in the yard. Seemed very calm. I didn't know there were three. I just was aware of two and they weren't that-that close to the gate. They were just somewhere around it. So I wasn't paying exact attention to how close they were.

Q. Have you viewed the security camera video of the incident that we've given your lawyer?

A. Very briefly. My mom watched it more than I did.

Q. Did you see in that video that all three of the -- all three of my client's dogs were at the gate at the time?

MR. TEDFORD: Objection. Form.

A. I only saw two. I didn't see three. But I watched it very briefly then so nope, I didn't know there were three. I just knew that there were two that were close. So after watching the video, I guess.

Q. (BY MR. HANSEN) After watching the video -- I'm sorry. Let me back up.

Page 128

When you watched the video, didn't you see three dogs right there at the gate the whole time as you jumped out of the delivery truck and ran to the gate?

MR. TEDFORD: Objection. Form.

Q. (BY MR. HANSEN) You may answer.

A. Can we rewatch it? Like, I don't recall. I mean, it's just like watching a movie. Unless I could go back here and watch it and could tell you right away. I mean, it's been like two weeks since I've seen it.

Q. Request for Admission Number 8, we asked you to admit that, quote, one or more of defendant's dogs was still barking close to the gate when you leaned down to place the package by it, end quote.

You said you could neither admit nor deny that request. Why not?

A. I don't even know the dogs were barking in the first place. How could I tell you if one or more were still barking? I don't recall.

Q. Request for Admission Number 9, we asked you to admit that, quote, you leaned down so close to the gate that one of defendant's dogs was able to make contact with you through the metal slats in the gate, close quote.

You made objection to that request and said you could neither admit nor deny it as worded.

Page 145

Q. Here is Exhibit 20 to your deposition. When was that photograph taken?

A. After the incident, I think Brandon had gone back and put the package down to make a picture of it. Because we never took a picture of the gate right at the event. I think he had gone back to get a picture.

Q. What do you mean he put the package down?

A. Well, like he moved it over to get like a photo off of the area. I didn't put the package -- I mean, it was in that area. I'm not sure where I set it but it was within that general area. So I think he went back just to get a picture of the dog after the event had happened sometime when I was in the waiting room.

Q. So you think this photograph marked as Exhibit 20 was taken the day of the incident after it occurred?

A. Correct. I think Brandon took a picture to show what the dog looked like. Or it could have been the animal cop police lady. It was either Brandon or her. I'm not sure who took it, but eventually it got texted to me.

Q. Who texted it to you?

A. Either Brandon or my mom.

Q. Did your mom tell you that an animal control officer sent her this photograph?

A. No. I mean --

Page 146

Q. Why did you mention an animal control officer?

A. Because she was in the hospital and she was trying to inquire about the dog and that she was going to go out to the house and take pictures of it and denote what type of dog it was.

Q. Do you know who took this photograph marked as Exhibit 20?

A. No, I do not.

Q. Do you know that Brandon moved the package from somewhere and placed it --

A. No.

Q. -- up against the gate in this photograph?

A. Your guess is as good as mine.

Q. Okay. Is that where you placed the package at the time of the incident on the day of the incident as shown in Exhibit 20?

A. I know it was somewhere around that area. I don't know if I set it against the fence or on the ground, but I know it was somewhere close, that general realm.

Q. Okay. You can't say for sure that it was leaning up against the gate post like it's shown here in Exhibit 20?

A. No. But I do know that picture was after. I can tell you that. That's clear discretion.

Page 147

Q. Is the dog depicted in Exhibit 20 the one that bit you?

A. Recalling back to the incident, yes. I knew the dog was black. After I turned away to leave and I had the bite, I knew that it was a black dog that had bit me. I didn't know what type of dog.

Q. How many black dogs were there on the Provinces' property on the day of the incident?

A. One. There were two that I was aware of and then after it had bitten me and I turned to leave, I was aware that there were three.

Q. So we can conclude as a matter of logic --

A. Yes.

Q. -- that this dog depicted in Exhibit 20 is the one that bit you?

A. Correct.

Q. Here is Exhibit 21 to your deposition. Who took that photograph?

A. Not sure, but I know it's now the property.

Q. When was this photograph marked as Exhibit 21 taken?

A. Sometime after the event.

Q. Do you know when?

A. No.

Q. Do you know who took Exhibit 21?

Page 148

A. No, sir.

Q. Here is Exhibit 22 to your deposition. Who took that photograph?

A. I don't know. I never took any pictures.

Q. When was Exhibit 22 taken?

A. After the event.

Q. Do you know what day it was taken?

A. No, sir.

Q. Do you know what Exhibit 22 is meant to show?

A. The fence, I would guess because that's the center point of viewpoint.

Q. Do you know why Exhibits 21 and 22 were taken?

A. One shows the actual gate. One shows the fence. So I would guess that they're just trying to piece together what the property looked like.

Q. Who is "they"?

A. Whoever took the picture.

Q. Okay. So you don't honestly know why it was taken, do you?

A. Besides showing the fence or the gate.

Q. Here's Exhibit 23 to your deposition. Who took that?

A. 23 I know was taken the same time as --

Q. My question is who took it?

A. I don't know.

37 (Pages 145 to 148)

I, KAREN LINDSEY SMITH, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_Karen Lindsey Smith_

KAREN LINDSEY SMITH

THE STATE OF TEXAS          )

COUNTY OF DENTON          )

Before me, Antonio Sandoval _____, on this day personally appeared KAREN LINDSEY SMITH, known to me (or proved to me under oath or through ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 22 day of September, 2016

_Antonio Sandoval_
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS
COMMISSION EXPIRES: 01-07-2019

**ANTONIO SANDOVAL**
**NOTARY PUBLIC**
**STATE OF TEXAS**
**NOTARY ID 12924255-3**
**1/8/2019**

GOODENOUGH & ASSOCIATES          (817) 261-9095



KAREN LINDSEY SMITH          08/26/2016          186

CHANGES AND SIGNATURE

WITNESS NAME: KAREN LINDSEY SMITH

DATE:   AUGUST 26, 2016

PAGE LINE          CHANGE                    REASON

Part 1 Pg 14 line 19,20    Charlotte BOEHm smith          wrong Spelling

Part 1 Pg 17 line 35       mederma cream          not Aderma Ø

Part 2 Pg 17 line 11       usrs  ula          name needed

Part 2 Pg 26 line 4        withstand          not withstain

Part 2 Pg 44 line 11       debrief - dog bite-training video & mum had to drive me there because of the hydrocalete"

Part 2 Pg 45 line 6        "it was dog bite training video with some quiz answer sheet-

Part 2 Pg 48 line 4-7      "stitches did not dissure — they were removed by the Dr. with scissors & pulling thread-

Part 2 Pg 49 line 25       stitched did not dissolve          miscommunication

EXHIBIT C

## Cause No. CV-2016-00729

| | | |
|---|---|---|
| **KAREN LINDSEY SMITH,** | § | **IN THE COUNTY COURT** |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **NO. 2** |
| | § | |
| **TERRY P. PROVINCE** | § | |
| **Defendant.** | § | **DENTON COUNTY, TEXAS** |

## <u>AFFIDAVIT OF ERIC M. ZOLLINGER</u>

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DENTON | § |

BEFORE ME, the undersigned notary, on this day personally appeared Eric Zollinger, who being by me duly sworn upon his oath, affiant testified:

"My name is Eric M. Zollinger. I am over the age of 18 years, competent in all respects to make this affidavit, have personal knowledge of the facts stated herein, and everything stated herein is true and correct.

I am the managing member of CastleRock Surveying, PLLC in Justin, Texas. I am the custodian of the records of CastleRock Surveying, PLLC. Attached to this affidavit is 1 page of records. The attached record is a part of this affidavit.

The attached record is kept by CastleRock Surveying, PLLC in the regular course of business, and it was in the regular course of business for an employee or representative of CastleRock Surveying, PLLC with knowledge of the act, event, condition, opinion, or diagnosis recorded to make the record or transmit information to be included in the records. The record was made in the regular course of business at or near the time or reasonably soon after the time the service was provided. The record attached hereto is the original or exact duplicate of the original.

I am a licensed surveyor in the State of Texas and have been licensed and registered as a professional land surveyor in the State of Texas since June 20, 2012. My license number is R.P.L.S. 6357.

I performed a survey of the property located at 6749 H. Lively Road, Ponder, Texas (the "Property") on August 11, 2017. Based on the survey I performed of the Property, the metal gate located at the front of the Property is approximately 0.6 feet inside the property line on the West and approximately 1.2 feet inside the property line on the East. The portions of the fence depicted in the detail of the survey are at or within the property line.

---

AFFIDAVIT OF ERIC M. ZOLLINGER                                                                PAGE 1

EXHIBIT C

Attached hereto as **Exhibit C-1** is a true and correct copy of the survey I performed on the Property. The survey depicts the location of the metal gate, the fence, and the property line on the Property.

The information contained in this affidavit is true and correct and based on my personal knowledge."

FURTHER AFFIANT SAYETH NOT.

_____
Eric M. Zollinger

SWORN TO AND SUBSCRIBED TO before me, the undersigned authority, by the said Eric M. Zollinger on the 22ⁿᵈ day of Sept. , 2017.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

JUDY REID
Notary Public
STATE OF TEXAS
Notary ID # 1188124-3
My Comm. Exp. April 12, 2020

AFFIDAVIT OF ERIC M. ZOLLINGER                                                    PAGE 2

# EXHIBIT C-1



DETAIL

H. LIVELY ROAD (POSTED)
21.5' ASPHALT SURFACE

JOHN McGOWEN SURVEY,
ABSTRACT NUMBER 798,
DENTON COUNTY, TEXAS

REMAINS OF GRAVEL DRIVE

4" PVC PIPE CULVERT

8" WOOD POST    8" WOOD POST

(N 89°58'40" E 984.70')
N 89°50'36" E 983.99'
64.6'

METAL GATE

LOT 24, BLOCK 1,
EAST PONDER ESTATES
CABINET C, PAGE 397,
P.R.D.C.T.

TERRY PAUL PROVINCE AND RENEE PROVINCE
INSTRUMENT NUMBER 95-R0014779
R.P.R.D.C.T.

1/2" IRF BENT

6" WOOD POST

LOT 4, BLOCK 1,
ROLLING HILLS ADDITION
CABINET H, PAGE 17,
P.R.D.C.T.

0    10'
HORIZ. SCALE IN FEET

---

SEE DETAIL

S 89°48'26" W 208.87'
(N 89°58'40" E 984.70')
N 89°50'36" E 983.99'
N 89°50'41" E 311.47'

1/2" IRF    1/2" IRF    1/2" IRF BENK    1/2" IRF

LOT 1E, BLOCK 1,
EAST PONDER ESTATES
CABINET L, PAGE 390,
P.R.D.C.T.

N 00°09'16" W 979.33'
(N 00°00'24" W 979.46')

LOT 2
EAST PONDER ESTATES
CABINET C, PAGE 397,
P.R.D.C.T.

LOT 3

LOT 24,
BLOCK 1,
EAST PONDER ESTATES
CABINET C, PAGE 397,
P.R.D.C.T.

TERRY PAUL PROVINCE
AND RENEE PROVINCE
INSTRUMENT NUMBER
95-R0014779
R.P.R.D.C.T.

BLOCK 1,
ROLLING HILLS ADDITION
CABINET H, PAGE 17,
P.R.D.C.T.

S 00°10'17" E 979.65'
(S 00°00'24" E 980.19')

LOT 3    LOT 4

IRFC "ONSITE"

1/2" IRF    488.39'    1/2" IRF    495.89'

S 89°51'42" W 984.28'
(S 89°58'47" W 984.70')

LOT 9, BLOCK 1,
EAST PONDER ESTATES
CABINET C, PAGE 397,
P.R.D.C.T.

LOT 7R2,
BLOCK 1,
KELLY ESTATES
CABINET Y, PAGE 298,
P.R.D.C.T.

LOT 8A, BLOCK 1,
EXTENSION NO. ONE OF EAST
PONDER ESTATES
CABINET H, PAGE 98,
P.R.D.C.T.

LOT 8B, BLOCK 1,
EXTENSION NO. ONE OF EAST
PONDER ESTATES
CABINET H, PAGE 98,
P.R.D.C.T.

JOHN McGOWEN SURVEY,
ABSTRACT NUMBER 798,
DENTON COUNTY, TEXAS

0    300'
HORIZ. SCALE IN FEET

---

I have this date 08-11-2017 directed a survey made on the ground of the property located at Lot 24, Block 1, of EAST PONDER ESTATES, an Addition to Denton County, Texas, according to the Plat recorded in Cabinet C, PAGE 397, Plat Records, Denton County, Texas.

This survey represents the results of an on-the-ground survey made under my direction and supervision on 08-11-2017. There are no visible or apparent intrusions, protrusions or easements except as shown hereon. This survey was performed without the benefit of a commitment for title insurance. There may be other easements that may affect this property.

Note: Address observed posted as 6749 H. LIVELY ROAD.

Note: Bearings are based upon the Texas State Plane Coordinate System, North Central Zone, North American Datum 1983, U.S. Survey Feet from GPS observations. All distances shown are grid measurements. Combined scale factor: 0.99987457, Convergence angle: 0° 40' 29".

Note: Field work completed on 08-11-2017.

*Eric M. Zollinger*
Eric M. Zollinger R.P.L.S. No. 6357
Date 08-14-2017

LEGEND

| | | |
|---|---|---|
| ● IRF = IRON ROD FOUND | Ⓢ SEPTIC LID | B.L. = BUILDING LINE |
| ● IRFC = IRON ROD FOUND WITH CAP | ⓈⓈ SANITARY SEWER MANHOLE | GPLS = OIL/GAS PIPELINE MARKER |
| TR TELEPHONE RISER | SM STORM SEWER MANHOLE | R.O.W. = RIGHT OF WAY |
| Ⓨ BURIED CABLE MARKER | ◯ CULVERT | FF = FINISHED FLOOR |
| Ⓔ ELECTRIC RISER | WM WATER METER | CM = CONTROLLING MONUMENT |
| ET ELECTRIC TRANSFORMER | ▷◁ WATER VALVE | * = BASE BEARING |
| GM GAS METER | W WELL | ( ) = PLAT OR DEED CALL |
| OIL & GAS PIPELINE MARKER | ⊕ IRRIGATION CONTROL VALVE | P.O.B. = POINT OF BEGINNING |
| UTILITY POLE | LIGHT POLE | P.O.C. = POINT OF COMMENCEMENT |
| GUY ANCHOR | FIRE HYDRANT | U.E. = UTILITY EASEMENT |
| ⊗ CLEAN OUT | | D.E. = DRAINAGE EASEMENT |
| | | AC = AIR CONDITIONER PAD |
| | | P.R.D.C.T. = PLAT RECORDS, DENTON COUNTY, TEXAS |

| | |
|---|---|
| ———— PROPERTY LINE | GRAVEL |
| —— — ADJOINER LINE | CONCRETE |
| — — — EASEMENT | |
| — — — UTILITY EASEMENT | D.R.D.C.T. = DEED RECORDS, DENTON COUNTY TEXAS |
| BUILDING LINE | |
| —OHE— OVERHEAD ELECTRIC | R.P.R.D.C.T. = REAL PROPERTY RECORDS, DENTON COUNTY TEXAS |
| —x— —x— WIRE FENCE | |
| WOOD FENCE | |
| CHAIN LINK FENCE | |
| METAL GATE | |
| GRAVEL | |

JOB NO. 2017061

DRAWN BY: EZ    DATE: 08-11-2017
CHECKED BY: EZ    DATE: 08-11-2017
SCALE: 1"= 300'    PAGE 1 OF 1

CASTLEROCK SURVEYING, PLLC
P.O. BOX 232, JUSTIN, TEXAS 76247
TELEPHONE: 940-242-1533
EMAIL: ERIC@CASTLEROCKSURVEYORS.COM
TEXAS BOARD OF PROFESSIONAL LAND
SURVEYING FIRM # 10194308

STATE OF TEXAS
REGISTERED
ERIC M. ZOLLINGER
6357
PROFESSIONAL LAND SURVEYOR

## Cause No. CV-2016-00729

| | | |
|---|---|---|
| **KAREN LINDSEY SMITH,** | § | IN THE COUNTY COURT |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **NO. 2** |
| | § | |
| **TERRY P. PROVINCE** | § | |
| **Defendant.** | § | DENTON COUNTY, TEXAS |

## AFFIDAVIT OF RENEE PROVINCE

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF _Denton_ | § |

BEFORE ME, the undersigned notary, on this day personally appeared Renee Province, a person whose identity is known to me. After I administered an oath to affiant, affiant testified:

"My name is Renee Province. I am the wife of Terry Province, the Defendant in this suit. I am over the age of 18 years, competent in all respects to make this affidavit, have personal knowledge of the facts stated herein, and everything stated herein is true and correct.

The dog that Plaintiff has identified as the "black dog" that bit her is named "Heidi." Heidi is now seven years old, weighs approximately 100 pounds, and is a mixed breed. At the time of the incident, Heidi was six years old.

Heidi has no vicious tendencies and had never bitten anyone before the incident at issue.

My husband, Terry, and I currently own five dogs, three of which, including Heidi, are mostly outdoors. The dogs are kept within our fenced-in yard. The dogs run along the fence and bark whenever someone passes by the yard or approaches the gate.

I was not present on my property when the incident at issue occurred. My husband and I were away together running errands. When my husband and I returned home, all of the dogs were still contained within the fence on our property.

I asked delivery people, including UPS, to leave packages outside the gate to our property.

My husband, Terry, and I preferred for delivery people to leave packages outside the gate to our property. We do not like strangers coming onto our property. We also fear that someone opening the gate and entering our property might not close and secure the gate properly when leaving, thereby making it possible for our dogs to escape our property. None of our dogs has ever attacked, chewed, or in any way damaged a package or piece of mail left at our property.

The package Ms. Smith was delivering on the day of the incident contained printer ink.

---

AFFIDAVIT OF RENEE PROVINCE                                                         PAGE 1

The information contained in this affidavit is true and correct and based on my personal knowledge."

FURTHER AFFIANT SAYETH NOT.

*Renee Province*

Renee Province

SWORN TO AND SUBSCRIBED TO before me, the undersigned authority, by the said Renee Province on the 28th day of September , 2017.



NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

DEVIN ERICKSON
Notary Public
State of Texas
ID # 13105328-7
My Comm. Expires 03-22-2021

---

AFFIDAVIT OF RENEE PROVINCE                                    PAGE 2

Filed: 11/7/2017 2:09 PM
Juli Luke
Denton County, County Clerk
By: Alexa Hagenbucher, Deputy

## CAUSE NO. CV-2016-00729

| | | |
|---|---|---|
| **KAREN LINDSEY SMITH,** | § | **IN THE COUNTY COURT** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **NO. 2** |
| | § | |
| **TERRY P. PROVINCE,** | § | |
| | § | |
| **Defendant.** | § | **DENTON COUNTY, TEXAS** |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## <u>SECOND AMENDED MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff Karen Lindsey Smith ("Plaintiff") files this Response to Defendant's Second Amended Motion for Summary Judgment (the "Motion"), and respectfully states the following:

## I.
## <u>INTRODUCTION</u>

1. Summary judgment is appropriate only where reasonable minds could not disagree on relevant facts, and applicable law. In other words, summary judgment is appropriate where a parties' right to judgment is obvious and indisputable.

2.      Defendant recently filed his *third* Motion for Summary Judgment. These motions all are based on the same causes of action, and on the same "facts."[1] Defendant has not explained, nor could he, why he believed it was necessary to file *three* motions to explain his "obvious and indisputable" right to judgment.

3.      The truth is, the relevant facts and applicable law are far from "obvious and indisputable." Plaintiff's dog is part German Shepherd and part Boxer – *both of which are widely recognized as "dangerous" breeds.* While the dog's breed does not necessarily make the vicious, it should have put Defendant on notice that he needed to use additional care to protect Plaintiff and the general public from the dog's inbred tendencies.

4.      Defendant has no legitimate excuse for failing to protect Plaintiff. During his recent deposition (which Defendant only gave after the Court ordered him to do so), Defendant testified that he installed chicken wire over a *portion* of the gate to his property – the main point of ingress and egress. If Defendant had installed chicken wire over the entire gate, his dog could not have bitten Plaintiff or anyone else who came to the gate. And yet Defendant did not do so for the sole reason that

---

[1]      Incredibly, Defendant previously claimed to know what his dog was thinking at the time it viciously attacked Plaintiff. Defendant makes no mention of this "fact" in his most recent Motion for Summary Judgment.

he ran out of chicken wire.  In other words, Defendant exposed Plaintiff to life threatening injuries simply to save a few dollars and avoid a trip to a hardware store.

5.      As explained below, and in Plaintiff's responses to Defendant's other motions, Defendant is not entitled to summary judgment.  This lawsuit needs to proceed to trial, at which time a jury will need to determine whether Defendant is responsible for his dog's attack on Plaintiff.

## II.
## FACTS

6.      This lawsuit involves a vicious attack (the "Attack") by one of Defendant Terry P.  Province's dogs upon Plaintiff.  On January 4, 2016, Plaintiff was working for United Parcel Service ("U.P.S.").  Plaintiff was a temporary, holiday season employee for U.P.S., but was working with an experienced driver.

7.      Plaintiff and her co-worker were dispatched to Defendant's home in Ponder to deliver a package.  Plaintiff's co-worker warned Plaintiff that Defendant kept dogs on his property.  To avoid any interaction with Defendant's dogs, Defendant's wife claims "before the incident at issue, [she] told delivery persons to put packages on the ground outside the gate/fence, and not attempt to put them over the fence." *Amended Motion* at Exhibit E.  In the Third Motion (but not in the Original Motion), Defendant claims this instruction was given not because of the dogs' violent tendencies, but instead because " [Defendant and his wife] do not like

strangers coming onto [their] property.  [Defendant and his wife] also fear that someone opening the gate and entering [their] property might not close and secure the gate properly when leaving the property, thereby making it possible for [their] dogs to escape [their] property." *Motion* at Exhibit D.  This "explanation" for Defendant's instruction in no way explains why Defendant's wife would have instructed delivery persons to place packages on the ground *outside* the gate/fence, and not on the ground *inside* the gate/fence.

8.     After driving to Defendant's home, Plaintiff exited the U.P.S. truck. Plaintiff saw two dogs on Defendant's property, but did not see a third dog.  *Motion* at Exh. B, at p. 48, ll. 11-14.  Plaintiff set the package outside the gate, as she was instructed by her U.P.S. co-worker.  *Id.* at p. 48, l. 21 to p. 49, l. 1; p. 50, l. 17 to p. 53, l. 3.  Plaintiff does not specifically recall whether she laid the package on the ground, leaned the package against the gate post, or gently tossed the package to the ground.  *Id.* at p. 52, l. 8 to p. 53, l. 3.

9.     While Plaintiff was leaving the package outside the gate, a third dog (the "Attack Dog") approached.  Without any warning, the Attack Dog stuck its head through an opening in the gate, and bit Plaintiff in the neck.  No one knows precisely why the Attack Dog acted this way, but Plaintiff (who was the only person in direct proximity with the Attack Dog) has testified "the [Attack Dog] obviously wanted the

package or wanted some type of toy or something. It was a little bit aggressive more than the norm. So it made a point of coming through the fence more than like a worst-case scenario." *Motion* at Exh. B, at p. 129, ll. 4-8.

10. Unfortunately, the Attack was both foreseeable and preventable. The Attack Dog is a large dog, weighing approximately 100 pounds. The Attack Dog is a mixed breed dog, comprised primarily of German Shepherd and Boxer. *See DNA Analysis,* a copy of which is attached as Exhibit A. Statistically, these dogs are extraordinarily dangerous. *See 14 Dog Breeds Blacklisted by Insurance Companies*, Psychology Today, May 27, 2014 (a copy of which is attached as Exhibit B). In fact, according to Forbes and Dog's World, the German Shepherd is the fourth most dangerous breed, and the Boxer is the eighth most dangerous breed. *See* Exhibits C and D. This does not mean that a particular dog of these breeds may be vicious; it does mean, however, that these breeds present a heightened risk, requiring greater care.

11. At very little time or expense, Defendant could have protected Plaintiff from the Attack Dog, but chose not to do so. Defendant has a wire fence around his property, with a gate at the primary point of ingress/egress. *T. Province Depo* (excerpts of which are attached as Exhibit F) at p. 33, l. 17 to p. 34, l. 8. There are

gaps in the gate. *Id.* Defendant knew there were openings in the gate "large enough for a dog that felt threatened, like [the Attack Dog], to stick its nose through." *Id.*

12.     Defendant and his wife have several dogs, some of which are "outside" dogs. In order to keep the smaller dogs on Defendant's property, he installed chicken wire over lower gaps in the gate. However, he did not cover the entire gate with chicken wire because "that's just how much wire [he] had at the time." *T. Province Depo* at p. 28, l. 21 to p. 29, l. 8. Had he done so, the Attack Dog would not have been able to stick his snout through the gate, and would not have been able to bite Plaintiff.

13.     Defendant's indifference to the public's safety is clearly shown by his actions following the Attack. During his deposition, Plaintiff's counsel asked Defendant what repairs, if any, he made to the gate after the Attack:

> Q.     Sir, since the time of the [Attack], have you made any changes to the gate?
>
> A.     No.
>
> Q.     You haven't put chicken wire all the way up?
>
> A.     No.
>
> Q.     *So if someone came to the gate and dropped a package again, this same thing, [the Attack Dog] could bite that person again?*
>
> A.     *I – I have no expectation that that would happen at all.*

Q.    *But it would be possible.*

A.    *It would be, in my opinion, monumentally improbable, but not impossible.*

*T. Province Depo* at p. 43, ll. 1-14.

**III.**
**OBJECTION TO SUMMARY JUDGMENT EVIDENCE**

14.    One of the primary issues in this lawsuit is whether the Attack Dog had vicious tendencies prior to the Attack. In order to demonstrate the Attack Dog's "peacefulness," Defendant offers (a) a picture of the Attack Dog lying next to a cat[2] and (b) affidavits of Defendant and his wife stating "[the Attack Dog] has no vicious tendencies and had never bitten anyone before the incident at issue." *See Affidavit of Terry Province* (Motion at Exh. A) and *Affidavit of Renee Province* (Motion at Exh. D).

15.    Plaintiff objects to the Affidavits of Terry Province and Renee Province on the grounds they are self-serving and conclusory. Under Texas law, a self-serving affidavit (*i.e.* an affidavit offered by a person with an interest in the outcome of the lawsuit) can be admissible summary judgment evidence, but must contain statements

---

[2]    Plaintiff's counsel cannot fathom how a picture of a dog and a cat is relevant to this lawsuit, or in any way supports the Motion for Summary Judgment. Plaintiff does not contend the cat was responsible for the Attack. Nevertheless, Plaintiff offers a photograph of her wounds (a copy of which is attached as Exhibit E) to show the damage caused by the Attack Dog. Plaintiff does not offer any opinion regarding the "peacefulness" of the cat.

that may be confirmed or denied by independent evidence. *Trico Techs. Corp. v. Montiel,* 949 S.W.2d 308, 310 (Tex. 1997); *Casso v. Brand,* 776 S.W.2d 551, 558 (Tex. 1989). Similarly, conclusory statements in affidavits are not proper summary judgment evidence if there are no facts to support the conclusions. *El Dorado Motors, Inc. v. Koch*, 168 S.W.3d 360, 366 (Tex. App.—Dallas 2005, no pet.); *Dolcefino v. Randolph*, 19 S.W.3d 906, 930 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (op. on reh'g).

16. In their affidavits, Defendant and his wife state "[the Attack Dog] has no vicious tendencies and had never bitten anyone before the incident at issue." *Aff. of Terry Province* (Motion at Exh. A) at p. 1; *Aff. of Renee Province* (Motion at Exh. D) at p. 1. Although Defendant and his wife clearly are interested persons, they have not offered any evidence (*e.g.* the testimony of a disinterested person) to verify their statements. In fact, the Mr. and Mrs. Province's statement that the Attack Dog "has no vicious tendencies" is so vague and conclusory that it would be impossible to confirm or negate such a statement. As such, Mr. and Mrs. Province's affidavits do not constitute admissible summary judgment evidence.

**IV.**
**ARGUMENT**

**A.     Traditional Motion for Summary Judgment.**

17.     In his previous Amended Motion, Defendant stated "[t]he facts and controlling law in this case are clear, and reasonable minds could not differ in applying them, so summary judgment in Defendant's favor, the equivalent of an instructed verdict at trial, is proper." *Amended Motion* at p. 5.  Nothing could be further from the truth.

18.     Texas adheres to the so-called "one bite" rule with respect to dog bites. *Marshall v. Ranne,* 511 S.W.2d 255 (Tex. 1974).  This name is misleading.  A dog owner is not free of liability the first time his or her dog attacks a person.  Instead, as the court noted in *Lewis v. Great Southwestern Corporation*, 473 S.W.2d 228, 230 (Tex.Civ.App.—Fort Worth 1971, writ ref'd n.r.e.) (emphasis added), "the owner of the dog is not liable for injuries caused by it, unless it is vicious and knowledge *or constructive knowledge* of that fact is shown or brought home to the owner."  In other words, if a man knows *or should know* that his best friend has vicious tendencies, that man cannot escape liability simply because his dog has not yet hurt someone. *See Rodriguez v. Haddock,* 2003 WL 1784923 at *2 (Tex.App.—Fort Worth, April 3, 2003, no pet.) (emphasis added).

19.    As the court recently recognized in *Stein v. Reger,* 2016 Tex. App. LEXIS 5961, 2016 WL 3162589 (Tex. App.—Houston [1st Dist.] 2016), a dog's breed can have a direct impact on whether a homeowner is liable for an attack.  In *Stein,* as in this case, the plaintiff was a U.P.S. worker who was attacked by a German Shepherd.  Although the defendants kept the German Shepherd in a fenced area, the dog jumped the fence and attacked the plaintiff.  The defendants filed a Motion for Summary Judgment, including affidavits stating that the dog never had bitten anyone before, and had not previously attempted to jump the fence.  Based in part on the defendants' statements that they "could never have anticipated that [the dog] may have been able to jump the fence," the court granted the defendants' traditional and no-evidence Motion for Summary Judgment.

20.    Even if a dog is not vicious, its owner may be liable for injuries the dog causes "if the plaintiff can prove the owner's negligent handling or keeping of the animal caused the injury." *Labaj v. VanHouten*, 322 S.W.3d 416, 420 (Tex. App.—Amarillo 2010, no pet.); *see Dunnings v. Castro*, 881 S.W.2d 559, 563 (Tex. App.—Houston [1st Dist.] 1994, writ denied) ("an owner of a dog may be liable for injuries caused by the dog even if the animal is not vicious, if the plaintiff can prove that the owner's negligent handling of the animal caused the animal to injure the plaintiff"). "Unlike strict liability claims, to prevail in a negligence action the plaintiff does not

have to prove that the animal was vicious or dangerous." *Muela v. Gomez*, 343 S.W.3d 491, 496 (Tex. App.—El Paso 2011, no pet.); *see Dunnings*, 881 S.W.2d at 562 (although finding of viciousness is necessary in strict-liability claim, it is not necessary in negligence claim). To sustain such a claim, the victim of the dog bite must show:  "(1) the defendant was the owner or possessor of the animal; (2) the defendant owed a duty to exercise reasonable care to prevent the animal from injuring others; (3) the defendant breached that duty; and (4) the defendant's breach proximately caused the plaintiff's injury." *Labaj*, 322 S.W.3d at 420-21.

21.    Although the *Stein* court found the defendant did not breach a duty to the plaintiff, its decision is instructive in this lawsuit.  "The threshold inquiry in a negligence case is duty." *Muela*, 343 S.W.3d at 497. The status of the plaintiff who was injured on the defendant's premises determines the scope of the defendant's duty. *Labaj*, 322 S.W.3d at 421.  A mailman, like Stein, is an invitee and, thus, the Regers had a duty to "exercise ordinary care to keep [their] premises in a reasonably safe condition." *Id.*; *see Dunnings*, 881 S.W.2d at 563 (holding mailman is invitee in dog-bite negligence case).  The extent of the duty of "ordinary care" depends to a certain degree "on proof of whether the risk of injury from a dog bite is foreseeable, *i.e.*, the dog owner's actual or constructive knowledge of the danger presented by his dog." *Labaj, 322 S.W.3d at 421*.  To establish that a defendant breached their duty,

the plaintiff "must present evidence showing [the defendant] did not act as a 'reasonable prudent person' would have acted in the same or similar circumstances in handling the dog":

> [The plaintiff] did not proffer evidence that the [defendants] breached any duty to [the plaintiff] by failing to secure [the dog]. [The plaintiff] did not identify any evidence that the [defendants] did not use 'ordinary care' in securing [their dog] behind an iron-wrought fence. In response to the motions, [the plaintiff] did not present any evidence concerning the height of the fence, [the dog's] size, *the typical height a German Shepherd can jump*, or that [the dog] had previously jumped the fence. In his brief, he makes one, conclusory statement regarding breach: that the [defendants] breached their duty by failing 'to ensure that [their dog], a large German shepherd, was properly secured in her enclosure.' This conclusory statement does not analyze how the [defendants] breached their duty or how the [defendants] should have secured [their dog] beyond doing what they had already done, that is, securing her in a fenced area.

*Stein*, 2016 Tex. App. LEXIS 5961 at p. 11, citing *Allen ex rel. B.A. v. Albin*, 97 S.W.3d 655, 666 (Tex. App.—Waco 2002, no pet.).

22.    Unlike in *Stein,* the Plaintiff in this lawsuit has offered summary judgment evidence regarding the well-known characteristics of the dog in question. The Attack Dog is a mixed breed dog comprised primarily of German Shepherd and Boxer. *See DNA Analysis* (Exh. A). These breeds are commonly known to be aggressive and territorial. In Forbes Magazine, German Shepherds are ranked as the

fourth most-dangerous breed, and are described as "a powerful dog that is loyal when well-trained *but can be fierce.*" Exh. B. Boxers likewise made the list at Number 8, and are described in Dogs World as "Boxers are hunting dogs and they have been used *as attack and guard dogs ever since being bred!* They have a powerful jaw and bite – *which is perfect for protection!"* Exh. C. These statements certainly are not meant to suggest that all German Shepherds and Boxers are vicious.[3] However, a responsible pet owner cannot ignore these in-bred traits when determining how to protect the public from these animals.

23. With the Attack Dog's inbred characteristics in mind, the Defendant's negligence clearly was a cause of the Attack. The gate to the Defendant's property has large openings through which the Attack Dog could place its head. *T. Province Depo* at p. 33, l. 17 to p. 34, l. 8. The Defendant was aware of these openings. *Id.* The Defendant could have covered these openings with chicken wire – *which he did for certain openings* – but did not cover all openings for the simple fact that he ran out of wire. *Id.* at p. 28, l. 21 to p. 29, l. 8. This allowed the Attack Dog to poke his head outside the fence, and bite the Plaintiff. The Defendant should not be permitted

---

[3] In the interest of candor, the undersigned counsel states that he personally owns a German Shepherd and a Pit Bull mix (the most "dangerous" breed on all three attached lists). The undersigned counsel's These dogs are well-trained and well-behaved. That said, the undersigned counsel certainly would not leave a hole in his fence such that the dogs could bite at passers-by. These dogs are simply too powerful and protective for their owner to take that kind of a chance with someone else's life.

to excuse his carelessness on the so-called "one bite rule," when he knew or should have known the Attack Dog might do exactly what it was bred to do, and he gave the Attack Dog the ability to do so (by knowingly leaving an open gap in the gate).

**B.      No Evidence Motion for Summary Judgment.**

24.      In addition to his traditional Motion for Summary Judgment, the Defendant seeks a no-evidence summary judgment. The evidence attached to this Response (including excerpts from Defendant's deposition transcript) establishes that Defendant owed a duty to protect Plaintiff (as an invitee) from the Attack Dog's dangerous and in-bred (*i.e.* foreseeable) tendencies. This evidence also establishes that Defendant breached this duty by failing to cover *known* openings in the gate when he easily could have done so. Finally, this evidence establishes that Defendant's breach of his duty was a proximate cause of Plaintiff's injuries. Therefore, for the same reasons that the Court should deny the traditional Motion for Summary Judgment, it likewise should deny the no-evidence Motion for Summary Judgment.

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests the Court to deny the Second Amended Motion, and grant Plaintiff all relief to which she may be entitled.

Respectfully submitted,

/s/ Mark D. Johnson

PAUL FLANNIGAN
State Bar No. 24012633
paul@flanniganlawfirm.com
MARK D. JOHNSON
State Bar No. 10770175
mark@flanniganlawfirm.com

FLANNIGAN & JOHNSON, P.L.L.C.
5600 Tennyson Parkway, Suite 330
Plano, Texas 75024
Phone: (972) 383-9377
Fax:    (844) 287-8882

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon the following party via the means indicated on November 7, 2017:

*Via E-mail and E-Service*
J. Brantley Saunders
Brantley@SaundersWalsh.com
Abigail K. Christmann
Abby@SaundersWalsh.com

/s/ Mark D. Johnson
Mark D. Johnson

| KAREN LINDSEY SMITH, | § | IN THE COUNTY COURT |
|---|---|---|
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | NO. 2 |
| | § | |
| TERRY P. PROVINCE, | § | |
| | § | |
| Defendant. | § | DENTON COUNTY, TEXAS |

## AFFIDAVIT OF MARK D. JOHNSON

BEFORE ME, the undersigned notary, on this day personally appeared Mark D. Johnson, a person whose identity is known to me. After I administered an oath to affiant, affiant testified:

"My name is Mark D. Johnson. I am an attorney representing Plaintiff Karen Lindsey Smith in this lawsuit. I am over the age of 18 years, competent in all respects to make this affidavit, have personal knowledge of the facts stated herein, and everything stated herein is true and correct.

Attached to Plaintiff's Response to Defendant's Second Amended Motion for Summary Judgment are the following exhibits:

- Exhibit A: DNA Analysis;

- Exhibit B: Excerpts from a Forbes Magazine on-line article entitled "Most Dangerous Dogs";

- Exhibit C: Excepts from an Inside Dogs World on-line article entitled "Top 10 Most Dangerous Dog Breeds in the World";

- Exhibit D: A Psychology Today on-line article entitled "14 Dog Breeds Blacklisted by Insurance Companies"; and

- Exhibit E: Photograph of Karen Lindsey Smith.

Exhibits B, C, and D are true and correct copies of articles, or portions of articles, I downloaded from the internet from the websites for Forbes Magazine, Inside Dogs World, and Psychology Today, respectively.

Exhibit A is a true and correct copy of a document produced by Defendant in this lawsuit. Exhibit E is a true and correct copy of a photograph produced by Plaintiff in this lawsuit."

---

**AFFIDAVIT OF MARK D. JOHNSON** **PAGE 1**

Further sayeth affiant naught.

_Mark D. Johnson_

Mark D. Johnson

SWORN TO AND SUBSCRIBED TO before me, the undersigned authority, by the said Mark D. Johnson on the 7th day of November 2017.

BEATRIZ E LOPEZ
Notary ID #131257254
My Commission Expires
August 23, 2021

NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

**AFFIDAVIT OF MARK D. JOHNSON**                                         **PAGE 2**

# EXHIBIT A



## Ancestry Report

## What breeds make up Heidi?

The Wisdom Panel™ Insights computer algorithm performed over seven million calculations using 11 different models (from a single breed to complex combinations of breeds) to predict the most likely combination of pure and mixed breed dogs in the last 3 ancestral generations that best fit the DNA marker pattern observed in Heidi. The ancestry chart depicting the best statistical result of this analysis is shown in the picture below.

| Boxer | Collie* | Labrador Retriever | Mixed Breed† | Mixed Breed† | Mixed Breed† | German Shepherd Dog | German Shepherd Dog |

**Great Grandparents** **Great Grandparents**

| Boxer / Collie Cross | Labrador Retriever Mix | MIXED BREED | Mixed Breed† | German Shepherd Dog |

**Grandparents** **Grandparents**

**Parents** **Parents**

Heidi

| Boxer / Collie / Labrador Retriever Mix | German Shepherd Dog Mix |

### Boxer / Collie / Labrador Retriever Mix crossed with German Shepherd Dog Mix

 † Mixed breed Ancestor. See next page for more details...

*Breed detected, however at a lower confidence. Such results are not included in accuracy calculations.

# German Shepherd Dog





**Height:**
22 - 26 in

**Weight (Show):**
48 - 89 lb

**Weight (Pet):**
48 - 97 lb

**Ears:**



**Muzzle:**



**Tail:**



The modern day German Shepherd breed is a cross between the long-haired, short-haired and wire-haired shepherd dogs of the German regions of Württemberg, Thuringia and Bavaria. Initially bred for herding, due to their strength, intelligence and excellent temperament, they became popular as guard dogs, guide dogs, search and rescue dogs, police dogs and military dogs. Max Emil Von Stephanitz sought to protect and refine the German Shepherd breed at the end of the nineteenth Century. German Shepherds were used as German police and military dogs during World Wars I and II. Allied soldiers during World War I took notice of the Shepherd's use as messenger dogs or search and rescue dogs as they were very good at locating wounded soldiers. Some soldiers introduced the breed to their home countries and the popularity of the German Shepherd took off, making it one of the most popular breeds in the world today. The German Shepherd Dog was recognized by the American Kennel Club in 1908.

German Shepherd Dogs are generally a combination of black and tan, though more or less black may be seen. There is also a "gray" variant where the tip of the hair is black and the rest is tan. A black mask and a black "saddle" are both common traits in this breed. Although not an AKC variant, all-white German Shepherds exist as a separate FCI breed. The coat comes in long and short varieties.







### Do you recognize any of these German Shepherd Dog traits in HEIDI?

- Personalities can vary from calm and watchful/observant to energetic.

- Eager to learn and respond well to reward-based training.

- Enjoy participating in dog sports such as agility, tracking, flyball, and competitive obedience.

- There have been reported incidents of German Shepherd Dogs being aggressive with other pets or people.

# Boxer



| Height: | | |
|---|---|---|
| 21 - 25 in | | |
| **Weight (Show):** | | |
| 55 - 66 lb | | |
| **Weight (Pet):** | | |
| 49 - 77 lb | | |



| Ears: | Muzzle: | Tail: |
|---|---|---|

  

The history of the Boxer dates back to nineteenth century Germany, where they were used for hunting deer and boar. The ancestors of the Boxer include the Bullenbeiszer and the Barenbeiszer, which are now both extinct. The crossing of those breeds with the English Bulldogs of the 1830's resulted in the Boxer as we know it today. Boxers were bred to be hunting dogs and they earned their name from the "boxing" pose they are known to take when standing on their hind legs. Later in the breed's development, it was made apparent that they were also well-suited for herding and the Boxer was used in more than a few circus acts due to its ability to learn tricks quickly and perform them on command. The popularity of Boxers started to increase rapidly in the 1860's when the German Boxer Klub was founded. At the turn of the twentieth century the Boxer made its way to the United States and the American Kennel Club recognized the Boxer as a breed in 1904.

The AKC breed standard for boxers requires that they come only in fawn and brindle (black and brown stripes) with the fawn ranging from a light tan to mahogany and restricts the amount of white seen on the dog. Accepted traits include a black mask commonly seen in the breed. White boxers also have a following; though do not meet the breed standard.

    

### Do you recognize any of these Boxer traits in HEIDI?

- Intelligent, hard working, and playful dogs, with a high amount of energy.

- Eager to learn and respond well to reward-based training using treats and favorite toys.

- Boxers seem to enjoy dog sports such as agility, flyball, rally and competitive obedience.

- Tendency to jump up on people, sometimes boxing with their front feet when doing so.

# Breed Ancestry Certification

Owner's name: **Renee Province**

Dog's name: **Heidi**

Date: **April 6, 2011**

Because I ♥ my dog.

### Statement of Authenticity

This certifies the authenticity of Heidi's canine genetic background as determined following careful analysis of more than 300 genetic markers using Wisdom Panel *Insights*. The purebred dog breed signature matches included in this analysis are those that were detected in the last three generations of Heidi's ancestry using the proprietary breed detection algorithm at Mars Veterinary.

Dr. Neale Fretwell
Research & Development Director



Boxer / Collie / Labrador Retriever Mix crossed with German Shepherd Dog Mix

**MARS**
veterinary

**Wisdom Panel** **Insights**

## DNA Sample Collection Form

**Important: Completed top sheet must be included in envelope for mailing with swab samples. PLEASE PRINT.**

Date: 3 /30/ 11

E-mail Address
(REQUIRED): _Smileyface2011@yahoo.com_

○ Please check here if you would like for us to send you future special offers and additional useful information from Mars, Incorporated. (Your information will be stored and processed in the US.) You can withdraw consent at any time by sending us an email.

### YOUR DOG'S INFORMATION

*Please complete all fields.*

Dog's name: _Hart_

Gender: ○ Male  ⊗ Female    Birthday: _4 / 1 /10_

### YOUR INFORMATION

*Please complete all fields.*

Name: _Randi Lawrence_

Address: _6344 H Ceci St_

City: _Ponder_    State: _TX_    Zip: _____

Phone: (___) 348 5570

### YOUR DOG'S REPORT

Please allow adequate time for your dog's sample to arrive at our laboratory. Your dog's breed identification report should be available online within 3 weeks after receipt of the sample.

An e-mail will be sent to the address provided above notifying you that your dog's report is available for download.

To check the status of your dog's report throughout the process, visit our status link at: WisdomPanelInsights.com.

©2010 Mars, Incorporated
Wisdom Panel is a trademark of Mars Incorporated.

Wisdom Panel Insights

# EXHIBIT B

# Forbes

## Investing / #MarketMoves

**Learn More** ABOUT THE LANDMARK CLINICAL TRIAL

See results

**ONZETRA** Xsail'
(sumatriptan nasal powder)
11 mg per nosepiece

ONZETRA Xsail is contraindicated in patients with:

- Ischemic coronary artery disease (CAD) or coronary artery vasospasm, including

© 2017 Avanir Pharmaceuticals, Inc. All rights reserved.



Most Dangerous Dogs      8 of 11

## 4. German Shepherd (including mixes)

Germans developed this breed from herding and hunting stock in the 19th century, producing a powerful dog that is loyal when well-trained but can be fierce.

**Fatal attacks since 1982: 26 Maimings: 137**



LIVE

Dreamforce Live Broadcast    November 6-9, 2017 Begins at 10:00 a.m. PST

WATCH NOW

LIVE

Dreamforce Live Broadcast    November 6-9, 2017 Begins at 10:00 a.m. PST

WATCH NOW

# Forbes

© 2017 Forbes Media LLC. All Rights Reserved.

# Forbes

## Investing / #MarketMoves



33% of Texas families don't have a dime saved for a rainy day. **Let's change that.**

*Political advertising paid for by the Texas Credit Union Association Legislative Action Fund*



**VOTE YES ON PROP 7** **$AVE TEXAS**



Most Dangerous Dogs       4 of 11

**8. Boxer**

A member of the Molossian family named after an ancient city in Albania, the Boxer was developed in Germany in the 19th century from hunting breeds.
**Fatal attacks since 1982: 10 Maimings: 45**



LIVE

Your path to innovation starts with Dreamforce. Watch live Now.

Tune in now for keynotes, sessions, new produc announcements, and more.

November 6-9, 2017
Begins at 9:00 a.m. PST

WATCH NOW

dreamforce | salesforce live

# EXHIBIT C

 

HOME     LATEST     DOG BREEDS     BREED GI   🔍   f

TOP LISTS

# Top 10 Most Dangerous Dog Breeds in the World



f   🐦   P   ✉   💬


SHARE TWEET SHARE EMAIL

Almost all dogs can cause unimaginable damage and danger, but certain breeds are more prone to showing dangerous reactions and cause fatalities! These breeds

---

**EDITOR'S PICK**


DOG TRAINING & BEHAVIOUR
Essentials to Know of a Dog Play


TOP LISTS
Top 10 Most liked Doberman Photos & Captions On Facebook


LATEST ON IDW
10 Videos that show how Bulldogs make perfect friends of babies

>


LATEST ON IDW
20 Secrets Why Dogs Make Us Happy


LATEST ON IDW
Top 10 Most Liked Bull Terrier Photos and Captions On Facebook!


TOP LISTS
12 Celebrities With Bull Terriers


STORIES
K9 Dog Dies After Rescuing 7 People From Earthquake


TO TOP

obedience so that they can live happily in various households and situations!

Although, aggressive traits are in the nature of these dog breeds, proper nurture can play a huge role in turning them into loving and loyal companions!





## 10. GREAT DANE



Source: https://www.pinterest.com/pin/197032

**TRENDING POSTS ON IDW**

Great Danes can be gentle giants if properly trained and cared for as they already

of dogs! But, if not trained and socialized from an early age, they can become quite dangerous and aggressive! Considering their massive body height and weight, they can bring about fatalities!

## 9. BOXER







Source:
https://www.pinterest.com/pin/361484

Boxers are hunting dogs and they have been used as attack and guard dogs ever since being bred! They have a powerful jaw and bite – which is perfect for protection! But,

attackers! Another thing to keep in mind while training Boxers is to avoid harsh treatment and punishment as these factors can make the situation even worse!

## 7. ALASKAN MALAMUTE



Source: https://www.pinterest.com/pin/232076



energy does not get positively used, they can turn into quite aggressive dogs! They have an emphasized need to hunt for prey, therefore, should be carefully looked after! One other important thing is that they are slow learners, which requires for a lot of patience while training them!

## 6. SIBERIAN HUSKY



Source:
https://www.pinterest.com/pin/493847

**Siberian Huskies**, just like the Alaskan Malamutes, have been bred as working dogs, and that is the reason they are not very social! But, with the right approach and training, you can make them become more friendly and calm! Poor socialization and training will

Page 313

dogs!



## 5. BULLMASTIFF



Source:
https://www.pinterest.com/pin/339177

As guard dogs, Bullmastiffs have a natural aggressive temperament, which if not properly cared for can turn out fatal! They are large dogs, therefore, training them and making them obedient is a

Page 314

## 8. WOLF HYBRID



Source:
https://www.pinterest.com/pin/314970

As you may have already understood, these dogs are a cross between grey wolves and dogs and this makes them quite unpredictable! They have a head of their own, wild and demanding! Many states have already banned the possibility of owning a Wolf Hybrid as a house pet!

## 4. DOBERMANN PINSCHER



Source:
https://www.pinterest.com/pin/407435

Doberman Pinschers are very intelligent, strong and very sensitive to sound! They will sense danger and will react on their own! They are naturally aggressive towards strangers and also their size plays a role in making them even more dangerous! If not properly trained and obedient, they can cause quite some damage!

## 3. GERMAN SHEPHERD



Source:
https://www.pinterest.com/pin/497295

German Shepherds can react on great speed and are extremely focused towards taking the danger down, they can cause fatal damage! Their aggressive nature can be somewhat toned down by appropriate training, socialization and affection! In this way, you will get a loyal and a very loving household pet!

## 2. ROTTWEILER



Source:
https://www.pinterest.com/pin/459648

Rottweilers have one of the worst tempers, and are also, considered unsuitable family dogs, especially for families where the owner is an amateur, without a calm and assertive nature! They need to be continuously trained and attentive to, in order to avoid dangerous reactions!

## 1. PIT BULL



Source:
https://www.pinterest.com/pin/258605

**Pit Bulls** are fighter dogs and they will enthusiastically go after their task until completed! They have a very powerful jaw and bite and are well-known to not release their bite so easily! Therefore, they should be trained and socialized from an early age in order to avoid unnecessary dangerous situations!

## RECOMMENDED FOR YOU

Page 318

# EXHIBIT D

**ɑ Counsellor** | City or Postal Code                                    Q



**Stanley Coren PhD., DSc, FRSC**
Canine Corner

# 14 Dog Breeds Blacklisted by Insurance Companies

Homes containing certain breeds of dogs have been
declared uninsurable

 Like

Posted May 27, 2014

SHARE           Tweet                    EMAIL          MORE

---

While you might love (https://www.psychologytoday.com/basics/relationships) your dog, the companies that
carry the insurance for your house, apartment, or condominium might not. In fact, your dog's breed might
determine whether or not an insurance company is even willing to provide coverage for your home.

The motivation (https://www.psychologytoday.com/basics/motivation) for denying insurance to households
with certain breeds of dogs is based upon financial considerations. As one representative of Allstate
Insurance told me, "We are in the business of evaluating risk, and based on what we know the dogs on our
*uninsurable list*' pose a higher risk." She went on to tell me that dog bites are a major financial burden for
the insurance industry. "Dog bite related claims accounted for more than one third of all homeowners
insurance liability claims paid out in 2013. That amounted to about $490 million, with the average claim
costing close to $30,000. But actual costs can be much higher. In 2011 A Washington State Superior Court
jury awarded a $2.2 million verdict to a woman who was attacked by two neighborhood pitbulls near her
home in Tacoma, Washington. The woman sued the dogs' owners whose homeowners policies were
unfortunately limited to $100,000 each."

In association with National Dog Bite Prevention
Week (which occurs in the month of May each
year) a number of insurance companies have
issued their lists of dog breeds which they
consider dangerous and according to their rules



Presa Canario

Source:

various names depending upon the company, such as "excluded dog breeds," "aggressive dog list," "insurance list of dangerous dogs," "prohibited dog breeds," and one simply labels it their "bad dog list." The dog breeds which can be found on these lists seem to be drawn from a series of research studies such as one commissioned by the U.S. National Center for Injury Prevention and Control that was published in 2000. It looked at the statistics on fatal dog bites (click here to read more about this (https://www.psychologytoday.com/blog/canine-corner/200810/biting-dogs-and-dangerous-breeds)). However, it seems as though any dog bite incident that receives wide media coverage can also land a dog breed on such a list. Thus the Presa Canario was a dog breed that few people had heard of prior to the media coverage of a 2001 incident in San Francisco. The media luridly described how a woman was viciously mauled to death by two of these big dogs in the hallway of her apartment building. As a result the owner of these dogs is now serving a sentence of 15 years to life in prison. Although the Presa Canario remains a quite rare breed in North America, it now seems to appear on every prohibited dog breed list issued by the insurance companies.

The use of such lists is not acceptable everywhere. In America the states of Michigan and Pennsylvania have restricted                 d pro        surar           s. Te                 have pending legislation that   Find a Therapist   bit c   Topics   o de   Get Help   to so   Magazine   only on the bree   Ex of dog owned by their household. These laws propose that insurance companies should only be allowed to deny or revoke a policy or to increase the premium, based on the risk associated with a specifically named dog. That means that the individual dog must have a known history of being aggressive or must have been officially designated as dangerous.

The insurance companies counter by saying that such laws will not work. They argue that by the time the dog has bitten someone, and has therefore been deemed dangerous, there has already been a claim filed. That means that it's already too late for the insurance company since they will have to cover the claim under the pre-existing unrestricted policy. The companies argue that the only way to reduce their financial risk is to ban certain dog breeds from coverage. Nonetheless there are some insurers that do not use a banned dog list, and some other companies that will allow a household to be insured simply by excluding coverage for liabilities due to damage caused by a dog.

ARTICLE CONTINUES AFTER ADVERTISEMENT

lis̶           . Most of these blacklisted not only the specific breed but any mixed breed that presumably included a genetic relationship to one of the banned breeds. The 14 most often blacklisted dog breeds were:

- Pit Bull Terriers

- Staffordshire Terriers

- Rottweilers

- German Shepherds

- Presa Canarios

- Chows Chows

- Doberman Pinschers

- Akitas

- Wolf-hybrids

- Mastiffs

- Cane Corsos

- Great Danes

- Alaskan Malamutes

- Siberian Huskies

Nonetheless you must remember that each company draws up its own list based upon its opinion of the risk the dog breed presents. No specific scientific criteria are required for a dog breed to be blacklisted, and it is possible that simply one report in the media might be enough to cause an official in an insurance company to decide that one or another dog breed is dangerous. That situation is bound to lead to some odd choices as to which breeds are uninsurable. For example, take the experience of Michael

# EXHIBIT E



# EXHIBIT F

CAUSE NO. CV-2016-00729

| KAREN LINDSEY SMITH | ) | IN THE COUNTY COURT |
|---|---|---|
| Plaintiff, | ) | |
| VS. | ) | NO. 2 |
| TERRY P. PROVINCE | ) | |
| Defendant. | ) | DENTON COUNTY, TEXAS |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

TERRY P. PROVINCE

SEPTEMBER 15, 2017

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF TERRY P. PROVINCE, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and -numbered cause on the 15th day of September, 2017, from 10:12 a.m. to 11:17 a.m., before Chrissa K. Hollingsworth, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Saunders, Walsh & Beard, located at Craig Ranch Professional Plaza, 6850 TPC Drive, Suite 210, McKinney, Texas, pursuant to the Texas Rules of Civil Procedure.

A P P E A R A N C E S

FOR THE PLAINTIFF:

        MR. MARK D. JOHNSON
        FLANNIGAN & JOHNSON, PLLC
        5600 Tennyson Parkway
        Suite 330
        Plano, Texas   75024
        972.383.9377
        mark@flanniganlawfirm.com


FOR THE DEFENDANT:


        MR. J. BRANTLEY SAUNDERS
        SAUNDERS, WALSH & BEARD
        Craig Ranch Professional Plaza
        6850 TPC Drive
        Suite 210
        McKinney, Texas   75070
        214.919.3555
        brantley@saunderswalsh.com


ALSO PRESENT:


        Ms. Renee Province

                              INDEX

Appearances............................... 02

Stipulations.............................. --


TERRY P. PROVINCE

       Examination by Mr. Johnson.......... 04


Signature and Changes.................... 44

Reporter's Certificate................... 46

                          EXHIBIT INDEX

NO.          DESCRIPTION                              PAGE

                            (NONE)

TERRY P. PROVINCE,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. JOHNSON:

Q. Sir, would you state your name for the record, please.

A. Terry Paul Province.

Q. And, Mr. Province, my name is Mark Johnson and I represent Ms. Smith, the Plaintiff, in this case. Do you understand that I am not here on behalf of you, I do not represent you and you have your own attorney?

A. Yes.

Q. Have you ever been deposed before?

A. No.

Q. Let me tell you a little bit about what today will be and what it won't be. It's not what you see on television and it's also not a conversation. It's going to be -- I'm going to ask a series of questions, and what I'm looking for is answers to the questions that I ask. It won't -- there won't be a lot of back and forth. So because of that -- and I know it's a -- it's an unusual way of talking. Normally, you know what I'm going to say before I say it, but I have to be able to say it so that the court reporter can get it down and everything's clear on the record. So would you agree

that when I'm asking you a question, let me finish the question before you start answering?

A. Yes.

Q. And, likewise, I will try to not ask the next question until you've completed your answer. Is that fair?

A. Fair enough.

Q. Okay. Also, if there's -- because we're trying to get a clear record for the Court. So if there's anything that I ask you that you don't understand, will you ask me to rephrase it?

A. Yes.

Q. Okay. And if I -- if you don't ask me to rephrase it, is it fair for me to assume that you understood my question?

A. Yeah.

Q. Okay. If you need to take a break, just let me know. This isn't a marathon. All I'd ask is that before we break, that you answer the question that's on the table. Would you agree to that?

A. Yes.

Q. Okay. Now, last thing. And this is very important for the court reporter and you don't want to get her mad. Look at her. She's tough. When you're giving your answers, it's important that you say yes or

no as opposed to uh-huh or huh-uh or shaking your head, because the court reporter can't always get that down clearly. Would you agree to try to do that?

A. Yes.

Q. Okay. Now, sir, would you state your home address, please.

A. 6749 H. Lively Road, Ponder, Texas 76259.

Q. And how long have you lived there?

A. Since spring of 1995.

Q. Okay. Now, you understand that this -- and I'm sorry. You live there with your wife; is that correct?

A. Yes.

Q. And her name's Renee?

A. Yes.

Q. Okay. Do you have any children?

A. Yes.

Q. Do they live there as well?

A. No, they don't.

Q. Okay. When -- when was the last time your kids lived at home?

A. Gosh, it's been 12 years, 13 years.

Q. Okay. Okay. So your -- your dog, the dog that's at issue in this case, Heidi, I think is her name. How old is Heidi?

A. She'll be seven now. At the time, she was five

and a half, six.

Q. Okay. So at -- when you got Heidi -- and you've had Heidi all her life; is that correct?

A. Yes.

Q. So at the time that you've had Heidi, no one lived in your house other than you and your wife; is that correct?

A. Yes.

Q. Okay. As between the two of you, you and your wife, which one would you say is the principal caregiver for the dogs or is it shared?

A. It's pretty -- I think it's shared pretty evenly --

Q. Okay.

A. -- I mean, in my opinion.

Q. Well, I guess I'll --

A. I think it's shared.

Q. I guess I'll ask your wife about that --

A. It's shared pretty evenly.

Q. Did you -- I'm sorry. Now, the -- Heidi, she's a mixed breed?

A. Yes.

Q. Do you know what breeds she's a mix of?

A. I don't. I take her to be -- I would call her a black lab mix.

Q. Okay. Do you know what she's mixed with?

A. No.

Q. I'm just asking because I have a -- I have a dog who's a mix and it's half lab and half pit, and Heidi looks an awful lot like my dog. I didn't know if you knew whether she was -- or what the black lab was mixed with.

A. I don't know. I don't know.

Q. Okay. Okay. Did you -- did you adopt her?

A. I --

Q. Get her from a shelter?

A. I got -- no, we didn't get her from a shelter.

Q. Did you buy her?

A. No.

Q. How did you come across Heidi?

A. My daughter saw Heidi in a road ditch, I believe, near --

Q. Okay.

A. -- the Denton airport, came home and told my wife about it. They went back -- I don't know, so this is --

Q. Sure.

A. -- my bad memory. They went back and the result was we gained another dog. She was a little black ball of fur.

Q. Well, when -- when we got our most recent dog, and we already have a German shepherd, my daughters -- when my daughter was in town, she decided that our shepherd needed a buddy and that I needed another buddy. So I got -- they came home with another dog for me, so I know how that goes. The -- when y'all -- if it's just you and your wife, when you're traveling, who takes care of Heidi and your other dogs?

A. The -- we usually try to take one or two or three of them with us and leave two or three at home.

Q. Okay.

A. We usually take some with us and leave some at home.

Q. Okay.

A. And we have -- they're able to get in the shop, and we leave food and water for them.

Q. So they're outdoor dogs primarily?

A. Two of them are indoor practically all the time and then three of them are outdoor or in the shop.

Q. Oh, so you have five dogs?

A. Yes.

Q. Okay. Okay. Is Heidi an outdoor dog generally or an indoor dog?

A. You mean indoor like in the house?

Q. Yes, sir.

A.   There are times when she's in the house, but it's a minimal amount of time.  Mostly, she's in the shop building.

Q.   Okay.  So if you're not at the -- at the house and your wife's not at the house, generally no one's looking after -- after the dogs?  They can just kind of --

A.   They're just on the property in the yard, yes.

Q.   Okay.  You don't have neighbors come by and check in on them?

A.   No.

Q.   Okay.

A.   We've never left them that long, no.

Q.   Okay.  How long have you left them, like an overnight thing or just a couple of days?

A.   Maybe three days, two or three days.

Q.   Okay.  Have you -- have you ever boarded Heidi?

A.   Not that I recall.

Q.   Okay.  But Heidi's been to the -- obviously, she goes to the vet's?

A.   Yes.

Q.   Okay.  And I saw that -- that you had a vet listed on your responses to the requests for disclosure that was at a PetSmart, ban -- well, I forgot the name of it, but it's a vet that's through PetSmart.  Is that

the principal vet that you use?

A. No. The principal vet has been Tim Hawkins. He calls himself The Mobile Vet.

Q. He calls himself the what, sir?

A. The Mobile Vet.

Q. Okay.

A. He has a motorhome and he will come to your house and --

Q. Oh.

A. -- do vet stuff.

Q. Makes house calls?

A. Yes.

Q. That's convenient.

A. Well, it's nice if you have five dogs.

Q. Uh-huh.

A. And Randy Wunche and the Denton Animal Clinic.

Q. Okay. The -- it's stated in your -- by the way, let's go ahead and it's --

MR. JOHNSON: It's already part of the record, so I don't know that we need to make it an exhibit, but I'll be referring to it. Unless you want to make it part of -- make it an exhibit.

MR. SAUNDERS: We'll see.

MR. JOHNSON: Here's an extra copy for you.

MR. SAUNDERS: Thank you.

Q. (By Mr. Johnson) Have you seen that -- that document, sir?

A. Let me look at it for a minute.

Q. Okay.

A. Yeah, I believe so.

Q. Okay. In that -- in that -- and I'll just refer to that as the motion. In the motion, you -- you mentioned that Heidi had received formal training from a commercial dog trainer that made her obedient to basic commands, come, sit, down, play, stay, off, quiet and release. That's correct?

A. Yes.

Q. Who was it who trained her?

A. I think it was -- you mean the company or the individual?

Q. Just the company's fine.

A. Oh, gosh. I don't remember the name of the company.

Q. Okay. Do you know when she was trained?

A. No, I don't remember the dates.

Q. Do you remember the year? I know it's been awhile.

A. Well, right. And I'm horrible with dates.

Q. Was she a puppy at the time?

A. As I can prove, I'm horrible with dates. No,

she wasn't. She wasn't a puppy. This would have been, gosh, four or five years ago, I'm thinking. I mean, she was young at the time, but she was not a puppy.

Q. Why did you take her in for training?

A. My wife likes them to go through the training mostly to socialize them with other dogs and to socialize them with other -- put them into the hands of somebody else who's going to train them, not just us, in other words.

Q. I understand.

A. But they learn to be -- get along with other people better because then they're in a situation -- that's basically why.

Q. Okay. Did -- were the other dogs trained as well?

A. I'm not sure what you mean. At that same place?

Q. Had the other dogs -- and let's just focus on the outdoor dogs for now. There -- as I understand it, there are three dogs that are principally outdoor dogs.

A. Right.

Q. Were those other outdoor dogs also commercially trained?

A. I guess I would have to go back and -- I don't recall exactly, honestly. Frank, who's also an outdoor

dog, I can tell you he definitely was not.  He's blind.

Q.  Okay.

A.  So he's -- I don't know how you'd go about training him.  It could be done, I suppose, but he's -- he is -- lives in his own blind dog world.

Q.  Okay.  Is he pretty calm?

A.  Totally calm.

Q.  Okay.  Was -- was there something about Heidi that made you seek training for her but not for -- you said his name is Frank?

A.  You mean something that was different about Heidi --

Q.  Yeah.

A.  -- in comparison to -- no.  It was just -- I mean, we have taken quite a few of our dogs -- not every last one of them, but quite a few of them to training just to socialize them with other dogs and to put them in the hands of other people to -- so they get along with other dogs and other people.

Q.  Okay.

A.  I mean, that's the primary.

Q.  Now, other than -- how close do you live to your neighbors?  You're out in the country, aren't you?

A.  Yes.  Our closest neighbor to the north is probably close to a mile away.

Q. Okay.

A. Other -- our closest neighbor to the west would be over a thousand feet.

Q. Okay.

A. Three city blocks. So the closest neighbor to the east would be a couple hundred feet, and to the south would be close to half a mile.

Q. Okay. Do any of your neighbors interact with your dogs?

A. No.

Q. So if -- if there's anybody who's going to know whether Heidi was -- about Heidi's behavior and background, it would be you and your wife?

A. Yes.

Q. Okay. Now, on the -- prior to the date when Heidi had a run-in with Karen Smith, had Heidi ever -- ever bit anyone or tried to bite anyone?

A. No.

Q. Had any of the other dogs?

A. No.

Q. Okay. Had they ever tried to, you know, tear a package or try to get to a package?

A. Never.

Q. Okay. That's one thing I was -- I was a little confused about, because in your motion you mention

that -- that you had instructed or your wife had instructed delivery services not to come on the property --

A. Yes.

Q. -- when making deliveries; is that correct?

A. Absolutely.

Q. Now, why didn't you want people coming on the property to make deliveries?

A. I don't want anybody coming on my property --

Q. Fair enough.

A. -- to deliver or just come and knock on the door. That's me. I'm old -- well, when we lived in Irving, I hated the fact that people could walk up to my front door.

Q. Okay.

A. That's me.

Q. Well --

A. And, I mean, I understand your wondering about that.

Q. Did you want to have -- if somebody came and was dropping off a package, did you have a problem with them opening up the gate and dropping off the package and doing that?

A. Yeah, I don't want them to do that. Where I come from, that's -- you don't do that. You don't open

somebody's gate. You honk your horn and you wait and see if they come out. If they don't, then you leave maybe a, you know, message on the mailbox or something. You don't open somebody's gate and just go in their yard. That's just me.

Q. Well, where's your mailbox? Is it outside your gate?

A. The mailbox is on the shoulder of the road. It's outside of the fence.

Q. Okay. The -- did the presence of the dogs have any bearing on why you didn't want people coming into the -- onto your yard?

A. Well, there's some concern especially with Frank. If he gets out, he can't find his way back home. He can't see. In his brain, he has that yard --

Q. Yeah.

A. -- but in the rest of the world, he has absolutely no idea.

Q. Okay. So part of your concern, then, was you didn't want Frank and the other dogs getting out?

A. Exactly.

Q. Okay.

A. I don't want them to get out, because that would be -- no, I don't want them to get out.

Q. Then why would it have been -- because I notice

that in the -- oh, and I'd have to find it in your motion, but one of the things that you said that you didn't want delivery services to do was leaving a package -- dropping off a package over the gate onto the ground inside the gate, inside the fence.

A. Yeah.

Q. Why would that be an issue?

A. Well, for me, it's -- if you tell them, okay, yeah, drop it over the fence, then, to me, that's -- there's only a semantic difference between telling them to come over the fence. I don't want them on my property either reaching over my fence or opening the gate and coming on my property. Maybe, you know, that's me. I'm --

Q. Would you have -- I'm sorry. I interrupted. I apologize.

A. Oh, no. That's a good place to interpret.

Q. Would you have had a problem with them putting a package through the gate, assuming the package would fit, of course, through the gate and onto your property?

A. Well, they've done that. They've tied -- they've tied packages in plastic bags to the gate and hung it over the inside of the gate and stuff like that, but why they do that, I don't know, but I don't want them to do that.

Q. Okay. Did you -- did you or, to your knowledge, your wife tell UPS, Do not put packages inside the -- inside the fence?

A. I've told them and she's told them, yes.

Q. Okay. Did you tell them to put the package outside your fence?

A. Yes.

Q. Did you tell them to not put the package up against the fence?

A. I believe that I told them to leave packages by the mailbox, which would be 20 feet from the fence.

Q. Okay. Why would you want the package left by the mailbox as opposed to by your fence?

A. Several. Because we would come home at the end of the day, get the mail and pick packages up from the same location. I'm honestly not any more worried about somebody passing by and stealing a package that's by the mailbox any more than I'm worried about them passing by and stealing one that's hanging from the gate or one that's just inside the fence.

Q. Okay.

A. I'd be equally concerned.

Q. Okay. The --

A. So that's not a --

Q. In the -- in the motion, it states -- and this

is on Page 2. It says, Plaintiff was told by her fellow employees to not enter Defendant's property but just set the package outside the front gate because Defendants preferred it that way. Is that correct?

A. Yeah.

Q. Okay.

A. I would --

Q. And then it goes on to say, She was not specifically instructed to get so close to the gate that she could lean the package against the gatepost, but admits she might have leaned it. Was -- is that -- well, was that something that you did not want her to do, to lean packages against the post?

A. Well, I -- no, I wouldn't want her to lean packages against the post.

Q. Why not?

A. It's not -- I mean, it's -- it's not necessary. I wanted them to leave packages by the -- near the mailbox or -- it's not an issue. It has never been an issue.

Q. Okay.

A. I mean --

Q. So you never instructed her -- or instructed UPS, Don't put packages by the gate? You instructed them that you'd like them over by the mailbox?

A.   Yeah.  Or -- yeah.  Pretty much on the ground --

Q.   Okay.

A.   -- and in the driveway, yeah.

Q.   Did you think there was a problem leaving packages -- other than your convenience, did you think that it presented a problem to put a package that close to the gate?

A.   Probably not.

Q.   Okay.  Were you at all concerned that if someone came up with a package close to the gate, that one of the dogs might snap at them?

A.   I would never have expected that to happen.

Q.   Okay.  In the motion, and I'll have to find it, and this is on Page 6, you state that, The dog that bit Plaintiff, and I'm assuming that was Heidi, was on Defendant's own property in a place it had a right to be.  Just so we can get the record clear, was -- at the time that Heidi bit Ms. Smith, was Heidi outside the fence?

A.   No.

Q.   Was Heidi's mouth outside the fence?

A.   Her -- I mean, if what the Plaintiff said happened, her -- her mouth would have had to have been outside the vertical plane, I guess you'd call it, of

the gate.

Q. Okay.

A. It was inside of the vertical plane of the fence, which I believe is also the property line by a foot.

Q. Okay. But the dog's nose or its snout was through the fence --

A. No.

Q. -- to your knowledge?

A. No, it was not through the fence. It was through the gate.

Q. Correct. I'm sorry.

A. And the gate is inside of the fence by about a foot.

Q. The -- there's no fence immediately to the -- immediately outside of the gate?

A. No.

Q. The gate basically serves as a connector between the fences; fence on one side, fence on the other side and the gate in the middle?

A. Well, if you can visualize, the fence is a vertical plane that, as far as I know, is right on the property line.

Q. Okay.

A. The gate is set inside of that about a foot --

Q. Okay.

A. -- is what I'm trying to tell you.

Q. How do you --

A. So --

Q. How do you know that the fence is on the property line?

A. Because when I was getting ready to build the fence, the surveyors or the phone company, I think it was -- I think it was Centel, I'm not positive. There was a fairly large survey crew out there and they were -- they surveyed pretty much the whole area --

Q. Okay.

A. -- for putting in telephone poles. I went out there and I thought I would capitalize on surveyors being there and find out where my property line is and where I could build the fence, because there were different versions of, you know, talking to ranchers and other people around there where you could build a fence. So I went out and I asked -- the guy who I think was the supervisor told me, When we're done, your property line will be about 12 inches from the south side of our telephone pole. You go there, you're good. You'll be on the property. And that's what I did, basically. I measured with a ruler and got about a foot -- I believe -- I don't know, but I believe that I'm within

inches.

Q. And that was my point. Your -- so any statements about -- about, you know, where the fence was in connection with the property line, that was based on something you had heard from somebody else?

A. Yes.

Q. Okay. You didn't do an independent survey on that?

A. I have not, no.

Q. Okay. When -- in that same paragraph, it states, Plaintiff, being Ms. Smith, was bitten because in a rush to make a delivery to Defendant's properly and heedless of the risk involved, she ran toward the gate where Defendant's dogs were already barking. What is that statement based on?

A. It's based on the video --

Q. Okay.

A. -- of what happened at the estate.

Q. Does that video have sound?

A. No, it doesn't have sound. I didn't -- it could possibly, but I didn't set it up for sound.

Q. Okay. So when you say that the dogs were already barking, that would have been based on whether you could see the dog's mouths going up and down?

A. Right.

Q. Okay. It then says -- but there's -- going back to that, that previous statement, other than the video, there's -- you don't have any evidence that -- that would show that that was what happened?

A. No. I wasn't there.

Q. Okay. And your wife wasn't there as well, correct?

A. Correct.

Q. The -- it goes on to say that -- that, Plaintiff failed to notice that Defendant's gate had openings in it large enough for a dog that felt threatened. Now, I'd like you to -- on the motion -- let's go to the back. And I'm going to in particular point to a -- it's Exhibit 5 and it looks like it's probably, oh, eight or nine pages from the back.

A. Okay.

Q. The -- this is your gate, correct?

A. Yes.

Q. And the dog that's shown there, is that Heidi?

A. Yes.

Q. Okay. And was -- the package that's there, do you know, was that the package that was left by Ms. Smith or do you know?

A. It looks exactly like it.

Q. Okay.

A. I don't -- I don't know if that picture in this photograph is it. I don't know.

Q. Sir, what was in that package?

A. Let me think about that for a minute. I'm not absolutely positive, but I believe it was ink cartridges for a printer, a colored printer.

Q. But you don't know for sure?

A. I'm not absolutely positive.

Q. And that's fine.

A. Pretty sure, not absolutely positive.

Q. That's fine. The -- I'm looking at this gate. And it appears that -- the fence that goes around your property is a wire fence, correct?

A. Yes.

Q. And that same wire appears to go across the front of the gate, a portion of it; is that correct?

A. Yes.

Q. Now, can you tell me why between the first slat, the slat that's closest to the ground and the next slat there is no wire? Why is that?

A. I didn't have wire to go down there at the time. Primarily, the -- we have different sizes of dogs --

Q. Uh-huh.

A. -- and -- that have come and gone over the

years.  The chicken wire at the -- that goes from the bar hanging below the bottom of the gate up to just above the second slat --

Q.  Uh-huh.

A.  -- that is to keep a couple of very small Dachshunds in the yard.

Q.  Okay.

A.  If you look to the right side of the gate between the gate and the telephone pole, there's a two-by-four vertically there.

Q.  Yes, sir.

A.  That's to keep another dog from squeezing between the gate and the telephone pole.

Q.  Okay.

A.  The larger wire going up, it's also to keep him from going through -- that same dog from going between the second rail or whatever you call it of the fence and the third one, because he would squeeze himself over there.

Q.  Okay.  So the -- so the purpose of this wire on the gate --

A.  To keep the dogs in the yard.

Q.  -- is to keep the dogs inside?

A.  Yeah.

Q.  If the wire had been -- had extended down

between the first horizontal slat and the second one,
could Heidi have gotten through -- gotten her nose
through that area?

A. You mean at the bottom or at the top?

Q. At the bottom.

A. I'm not sure I understand your question.

Q. Well, I'm going to point to it.

A. Okay.

Q. I'll see if I can describe it. From the
ground, you have the first horizontal slat.

A. Right.

Q. Then you have the second horizontal slat and
the wire starts at the top of the second horizontal slat
and runs up.

A. Yes.

Q. Between the first and second slat, there's no
wire.

A. There's chicken wire.

Q. I don't see any wire there, sir.

A. That's chicken wire, definitely.

Q. That's chicken wire?

A. Yeah. There's chicken wire that goes down to
the -- that bar that runs along the bottom of the gate.

Q. Oh, okay.

A. And then it goes up to just above -- well, it

goes up to about halfway between the second rail of the gate and the third.

Q. Okay.

A. Because that just happened to be -- I mean, there's no reason for it to -- I mean, that's just how much wire I had at the time.

Q. Okay.

A. It's a -- it's a patchwork wire job.

Q. I understand. If the --

A. But the wire -- sorry to interrupt.

Q. Please.

A. But the chicken wire is there to keep small dogs, and the bar on the right is to keep -- it's to keep dogs in the yard, all of it.

Q. Okay. If there had been chicken wire -- and this gate, is that the only -- the only entranceway to your property?

A. For everybody else in the world, yes.

Q. Who is everyone other --

A. You mean for visitors or --

Q. Yes, for visitors.

A. Yes.

Q. Okay. So anybody who's going to visit your property is going to go to that gate?

A. Yes.

Q. Is there a bell on there they can ring or --

A. No.

Q. They just have to call you or yell in there to tell you --

A. Generally speaking, we know if they're coming or they honk their horn.

Q. Okay. If somebody were leaving something for you, and let's say it was not someone with UPS or some delivery service --

A. Uh-huh.

Q. -- and they wanted to leave that package by the gate for you, would they have been subject to the same risk as Ms. Smith of getting bit by a dog?

A. No.

MR. SAUNDERS: Objection, form. You can answer.

THE WITNESS: What?

Q. (By Mr. Johnson) You can answer. He just -- if I say something that's not -- that he has an objection to, he has to say it to put it on the record, but you can answer.

A. I had no expectation for anybody to be at any risk. I mean, I'd have to say no. I mean --

Q. Well, sir, I'm -- I'm a little confused, then, because in -- in -- this is, once again, under the

arguments section of your motion. It says that -- and it's at the end of that paragraph, that, Ms. Smith failed to notice that Defendant's gate had openings in it large enough for a dog that felt threatened, like the one that bit her, to stick its nose through or unlike at least one prior occasion when she had made a delivery to Defendant's property without mishap. This time she simply bent down too close to the gate without leaving the package to be delivered, failing to keep a proper lookout for her own safety. If the dogs didn't present a risk, then how was -- how was it that Ms. Smith failed to keep a proper lookout for her own safety?

A. I think that it -- she changed the dynamic of everything by running toward the gate.

Q. Okay. And that's -- that's based on the video?

A. Based on the video and her own statements.

Q. Had anyone ever run up to your gate?

A. Not to the best of my knowledge.

Q. Are there kids in the neighborhood?

A. There are, and they never run up to the gate.

Q. Do you ever have, like, a kid on a bike or just running run past the front of your property?

A. Yeah.

Q. Do the dogs go crazy?

A. If they have another dog with them, they'll run

along the fence and bark at the dog.

Q. What if they don't have a dog with them?

A. Generally, they ignore them.

Q. Do you know why, then, Heidi wouldn't have ignored Ms. Smith?

A. The truck, the UPS truck, and the fact that she ran at the gate. I mean, the trucks get attention from all the dogs I've ever had. So that's like a big noise and a big truck. The dogs come to look.

Q. Okay.

A. And she's running from the truck to the gate, I think.

Q. People have left packages at that gate before, haven't they?

A. Not like that, no. They leave them on the ground a couple feet from the gate. I'm at a loss as to why you would leave it like that, frankly.

Q. So is it your position that Mrs. Smith -- or Ms. Smith was -- because she jogged up to the gate and put down the package, it's your position that that's why she got bit?

A. I think it definitely contributed. I don't think it's -- I think it definitely contributed, yes.

Q. Okay. Do you have any -- and I'm -- I don't mean to be a smart aleck about this, it's just a

question. Are you in any way trained in animal psychology?

A. No.

Q. So you don't know what was going on in your dog's mind at the time that she bit Ms. Smith?

A. No, I don't.

Q. Did -- was there anything that prohibited you from having -- other than simply not having the wire, from having chicken wire run up the full extent of the gate?

A. I had no expectation that anything like that was needed. There was -- I had no cause, in other words, to make me think it was needed. And that -- I mean, to me, the logical extension of that would be to cover not only the gate but the entire perimeter of the property with chicken wire.

Q. Well, sir, the only place where someone was going to enter or leave your property was at the gate, correct?

A. Or approach the property, yeah, I mean, at or around the gate.

Q. Okay. So the only place where the person -- if someone was coming onto your property or leaving something right outside your property, the only place that they would come into contact, potentially, with

your dogs was at the gate?

A. Yeah.

Q. Okay. Did you know that, as stated in the argument section of the motion, that the gate had openings in it large enough for a dog that felt threatened, like the one that bit Ms. Smith, to stick its nose through?

A. Yes.

Q. Okay. Had anyone ever come -- well, let me rephrase that. Do you know whether your dogs act differently when you're at home as opposed to when you're not at home?

A. I'm not sure I understand.

Q. Do you have -- and I understand that if -- if you and your wife aren't home, you're not going to have firsthand knowledge of how the dogs are acting.

A. Yes.

Q. But do you -- do you have any videos or have you reviewed any videos or spoken to any of your neighbors who have said that the dogs will act more aggressively when you're not home as opposed to when you are home?

A. No.

Q. Okay.

A. I mean, could -- sorry to interrupt you. The

video -- I mean, now that you mention it, I have looked at videos of the dogs' behavior, I mean, incidentally in, you know, curiosity about other things.  I've looked at videos and the dogs almost seem less active when we're not there.  Frankly, I've wondered where the dogs are.

Q.  When were those videos taken?

A.  Up over a period of time before and after the incident.

Q.  Okay.  Were they taken at the time of deliveries?

A.  There are videos of delivery times, yes.

Q.  Okay.  At the time of the previous deliveries, did the dogs bark?

A.  Yes.

Q.  Did they run to the fence?

A.  Sometimes, yes.

Q.  Okay.  When they were running to the fence, were they acting aggressively towards the person who was coming to make the delivery?

A.  Not in my opinion.  They were acting like dogs in their yard.

Q.  Okay.  Now, at no time during those deliveries did -- well, I'll ask you:  During those deliveries, did Heidi ever go up to the fence and stick her nose through

the -- through the wire?

A. Not that I saw, no.

Q. Okay. Just a second. Sir, you produced a video of -- of the -- what you say is the incident and some previous deliveries, correct?

A. And I think some subsequent --

Q. You're familiar with that video?

A. Yes.

Q. That video was taken by a camera located on your property; is that correct?

A. Yes.

Q. The dates on the video are wrong.

A. Yes.

Q. Correct? The -- how do you know that the incident that's shown on the video was the same as when Heidi bit Ms. Smith?

A. Well, because it -- I mean, to find the incident, literally, I went from the end of the video and went back in 24-hour increments --

Q. Okay.

A. -- just counting back days.

Q. Okay.

A. Disregard the date because it's wrong.

Q. So you knew when the last date was and then you just counted back from there?

A. Yes.

Q. Okay.

A. And ended up at the incident.

Q. Okay. And that's how you determined what -- what you believe the dates to be of the different --

A. Yes.

Q. -- things that are shown? In that video, you state that -- or in your motion, you state that the video shows prior deliveries by Ms. Smith.

A. Yes.

Q. I've looked at the video and I couldn't tell who it was. How did you know it was Ms. Smith?

A. Because I believe -- I don't know absolutely for a fact, but I believe that she was the only female working during that period of time in that area. And I could tell that it was a female in the video.

Q. How do you know she was the only -- only female working?

A. I believe she said that. I'm not positive.

Q. Okay. So she said it in her deposition. That's what your statement would have been based on?

A. Yes.

Q. Okay. Just one second, please. What are your dogs -- do they have toys that they play with, chew toys?

A. They do have toys.

Q. Okay. What kind of toys are they generally?

A. Well, Shooter doesn't play with toys. He's never been interested in toys. I don't know.

Q. I'm sorry. That dog's name again?

A. Shooter, the little Red Heeler/Dachshund --

Q. Oh, okay.

A. -- mix dog, whatever that is. Frank is blind. He doesn't know what a toy is except that he gets hit with them once in awhile. Heidi loves to play ball, so the large tennis balls.

Q. Okay.

A. I guess that's what they are. I think they're called Kong balls or something like that. And she likes for you to throw them and she brings it back and gives it to you and you can throw it again.

Q. Okay.

A. She likes to get the ball.

Q. When -- when you're throwing to Heidi -- and I know with my dogs, if I don't throw it quick enough, they'll come up and try to -- try to take it out of my hand. Does that ever happen with Heidi?

A. Well, she has been trained. And we tell her to sit, and we throw the ball and she goes.

Q. Okay. If you don't say sit, will she come to

you?

A. She -- if -- you mean come after the ball --

Q. Yeah.

A. -- in your hand?

Q. Yeah. Yes.

A. She stays back a couple feet and watches, I mean, anxiously for you to -- you know, what are you going to do with the ball.

Q. Okay.

A. When its in my possession, it's my ball. That's our -- the understanding. I mean, she doesn't grab it back out of my hand.

Q. Okay. Do you think it's possible that Heidi -- at the time that she bit Ms. Smith, that she was simply trying to get what was in Ms. Smith's hand?

MR. SAUNDERS: Objection, form. You can answer.

A. No.

Q. (By Mr. Johnson) Why not?

A. I think that she was -- I think that -- well, again, I'm --

Q. I understand that you're not --

A. I'm not qualified to speculate. So, I mean, what I would speculate on it would probably be --

Q. And the only reason I'm asking is because in

the motion, you do speculate as to what it was that caused this. So I'm asking you: Is it -- is it possible that she was simply going for whatever was in -- in Ms. Smith's hand or was she --

A. No.

Q. -- going for Ms. Smith?

MR. SAUNDERS: Objection, form.

A. I don't think it was either.

Q. (By Mr. Johnson) Do you have any opinion as to why she attacked?

MR. SAUNDERS: Objection, form.

A. I disagree with the term attack.

Q. (By Mr. Johnson) You're saying Heidi did not attack Ms. Smith?

A. I'm saying that in my opinion, probably what happened was there was a collision between Ms. Smith's -- an extremely regrettable collision between Ms. Smith's neck and Heidi's nose/mouth.

Q. Okay.

A. Like I said, it was a horrible event and I wish it would never have happened. I wish nothing like this on anybody ever at all. Heidi's has been a great, wonderful dog.

Q. And since this event, there's been nothing -- no additional problems with Heidi?

A. No.

Q. Okay. In your motion, you state that, Plaintiff was bitten because in a rush to make a delivery to Defendant's property, and heedless of the risk involved, she ran towards the gate where the dogs were already barking. What risk are you talking about?

A. Well, I guess if -- frankly, if I personally composed this, I wouldn't have put that statement in there. I think that on the other hand --

MR. SAUNDERS: Let me stop you real quick because I'm confused. The statement -- are we talking about something the lawyer wrote in argument or have we gotten to him and his affidavit? I don't see that statement in the affidavit.

MR. JOHNSON: I haven't gone to the affidavit yet, but this was --

Q. (By Mr. Johnson) But you had said that you read -- you had read that motion.

MR. SAUNDERS: I just object to the term that it's his statement. It's the argument that the lawyer made. I thought you were referring to -- sorry. I thought you were referring to his affidavit here. I didn't see that there.

THE WITNESS: Page 6, I think.

MR. SAUNDERS: Got you. You can rephrase

it and I'll withdraw my objection.

MR. JOHNSON: Okay.

Q. (By Mr. Johnson) Do you agree with that statement that's contained -- that I just read that's contained in the motion?

A. I would probably -- like I said, I would probably modify the part that says, Heedless of risk involved. I'm not sure what I would modify it to, but that's --

Q. Well, are you saying that Heidi did not present any risk to Ms. Smith?

A. Gosh, I've got to tell you that the fence probably and the fence posts and the wasps that have a nest built into the telephone pole right there presented a risk. But, in my mind, I had never conceived of or considered that the dogs were a risk. I mean, if that's the -- that would be one way to read that statement, was that the risk was purely of the dogs. And I would disagree with reading it that way, is what I'm saying --

Q. Okay.

A. -- frankly.

MR. JOHNSON: Go off the record for a second.

(Recess from 11:09 a.m. to 11:11 a.m.)

MR. JOHNSON: Back on the record.

Q. (By Mr. Johnson) Sir, since the time of the incident, we'll just call it that, with Ms. Smith and Heidi, have you made any changes to the gate?

A. No.

Q. You haven't put chicken wire all the way up?

A. No.

Q. So if someone came to the gate and dropped down a package again, this same thing -- Heidi could bite that person again?

A. I -- I have no expectation that that would happen at all.

Q. But it would be possible?

A. It would be, in my opinion, monumentally improbable, but not impossible.

Q. Okay. Because the hole in the gate where the -- between where the wire is is still there?

A. Yeah. It has not changed.

Q. Okay.

MR. JOHNSON: Pass the witness.

MR. SAUNDERS: We'll reserve ours until trial.

(Deposition concluded at 11:17 a.m.)

CHANGES AND SIGNATURE

WITNESS NAME:  TERRY P. PROVINCE

DEPOSITION DATE:  SEPTEMBER 15, 2017

PAGE          LINE      CHANGE              REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

I, TERRY P. PROVINCE, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
TERRY P. PROVINCE

THE STATE OF _____)
COUNTY OF _____)

Before me, _____, on this day personally appeared TERRY P. PROVINCE, known to me (or proved to me under oath or through _____) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, _____.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF _____

CAUSE NO. CV-2016-00729

KAREN LINDSEY SMITH         )    IN THE COUNTY COURT
                            )
        Plaintiff,          )
                            )
VS.                         )    NO. 2
                            )
TERRY P. PROVINCE           )
                            )
        Defendant.          )    DENTON COUNTY, TEXAS


REPORTER'S CERTIFICATION
DEPOSITION OF TERRY P. PROVINCE
SEPTEMBER 15, 2017


I, Chrissa K. Hollingsworth, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, TERRY P. PROVINCE, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on _____ to the witness or to the attorney for the witness for examination, signature and return to me by _____;

That the amount of time used by each party at the deposition is as follows:

MR. MARK D. JOHNSON.......01 HOUR(S):03 MINUTE(S)
MR. J. BRANTLEY SAUNDERS..00 HOUR(S):00 MINUTE(S)

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

FOR THE PLAINTIFF:

MR. MARK D. JOHNSON
FLANNIGAN & JOHNSON, PLLC
5600 Tennyson Parkway
Suite 330
Plano, Texas   75024
972.383.9377
mark@flanniganlawfirm.com

FOR THE DEFENDANT:

MR. J. BRANTLEY SAUNDERS
SAUNDERS, WALSH & BEARD
Craig Ranch Professional Plaza
6850 TPC Drive
Suite 210
McKinney, Texas   75070
214.919.3555
brantley@saunderswalsh.com

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me this 29th day of September, 2017.

_____
Chrissa K. Hollingsworth
Texas CSR No. 8269
Expiration Date:  12/31/17
Gwendolyn Parker & Associates
Firm Registration No. 244
4144 North Central Expressway
Suite 600
Dallas, Texas  75204
1.877.747.8007
gwenparker@gwenparkerinc.com

FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition was/was not returned to the deposition officer on _____;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Mr. Mark D. Johnson, Custodial Attorney;

That $_____ is the deposition officer's charges to the Plaintiff for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein on _____ and filed with the Clerk.

Certified to by me this _____ day of _____, 2017.

_____
Chrissa K. Hollingsworth
Texas CSR No. 8269
Expiration Date: 12/31/17
Gwendolyn Parker & Associates
Firm Registration No. 244
4144 North Central Expressway
Suite 600
Dallas, Texas 75204
1.877.747.8007
gwenparker@gwenparkerinc.com

**Cause No. CV-2016-00729**

| | | |
|---|---|---|
| **KAREN LINDSEY SMITH,** | § | **IN THE COUNTY COURT** |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **NO. 2** |
| | § | |
| **TERRY P. PROVINCE** | § | |
| **Defendant.** | § | **DENTON COUNTY, TEXAS** |

**DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S SECOND AMENDED MOTION FOR SUMMARY JUDGMENT**

**TO THE HONORABLE JUDGE OF SAID COURT:**

**COMES NOW** Defendant, Terry Province (hereinafter "Province"), and makes, files and serves this his Reply to Plaintiff's Response to Defendant's Second Amended Motion for Summary Judgment pursuant to Texas Rule of Civil Procedure Rule 166a, and in support thereof would respectfully show this Honorable Court the following:

**I.**
**Plaintiff's Response Fails to Raise a Genuine Issue of Material Fact**

*This Reply is filed solely to point out how and why Plaintiff's Response to Defendant's Second Amended Motion for Summary Judgment ("Plaintiff's Response"), even when viewed in the light most favorable to Plaintiff, fails to raise a genuine issue of material fact. Plaintiff's creative use of terms such as "the attack dog" and "vicious attack" does not change the fact that she has not*

---

**DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S SECOND AMENDED MOTION FOR SUMMARY JUDGMENT** **PAGE 1**

*produced any credible evidence to create a fact issue. The facts of this case simply do not merit putting Mr. Province through trial.*

## II.
## Plaintiff Fails to Raise a Genuine Issue of Material Fact as to all of Plaintiff's Claims Against Defendant

Plaintiff's claims all revolve around the same issue – whether Heidi sticking part of her snout between the slats of the gate and biting Plaintiff was foreseeable. See *Labaj v. VanHouten*, 322 S.W.3d 416, 421 (Tex. App.—Amarillo 2010, no pet.) (the extent of a dog owner's duty depends "on proof of whether the risk of injury from a dog bite is foreseeable, i.e. the dog owner's **actual or constructive knowledge** of the danger presented by his dog") (emphasis added). This incident, involving this dog, which had no prior violence-related issues, ever, was not foreseeable and Plaintiff has failed to provide any proof to the contrary, as no such evidence exists.

Province has owned Heidi since she was a puppy and had no reason to think that Heidi had any vicious propensities. See *Defendant's Motion for Summary Judgment*, Exhibit A. Heidi had never bitten anyone prior to the incident and is normally a well-behaved dog. See *id.* Province cannot be liable for injuries caused by Heidi in a place she had the right to be – inside the Provinces' yard – because he **did not know** that Heidi had any vicious propensities. See *Rodriguez v. Haddock*, 2003 Tex. App. LEXIS 2940 at *2 (Tex. App.—Fort Worth, April 3,

2003). In fact, prior to that day, Heidi had no vicious propensities, and that is why Plaintiff cannot produce any evidence on this point.

### A. *Plaintiff Fails to Produce Any Evidence that Heidi was a Vicious Dog.*

Plaintiff's assertion that Heidi's alleged "inbred characteristics" somehow automatically mean that Heidi may have vicious characteristics is not only without merit, it would create new law that simply does not, and should not ever, exist. In Plaintiff's Response, Plaintiff asserts that Heidi is primarily German Shephard and Boxer. See *Plaintiff's Response*. However, the DNA test Plaintiff relies on for this assertion indicates that Heidi is a mix of Boxer, Collie, Labrador Retriever, German Shephard, and other unknown mixed breeds. See *Plaintiff's Response*, Exhibit A.

Additionally, Plaintiff produced several articles listing and describing dangerous dog breeds, including German Shephard and Boxer. See *Plaintiff's Response*. However, these articles are all inadmissible hearsay and Province objects to them on this basis. Furthermore, regardless of their credibility, the articles do not establish that **Heidi**, specifically, had any vicious propensities. Plaintiff acknowledges that these articles "**do[] not mean that a particular dog of these breeds may be vicious.**" See *id*. Province agrees. Even if they were admissible, they have no value in this case. The articles Plaintiff relies on simply cannot and do not establish that Heidi had any vicious tendencies because they are

inadmissible hearsay and are wholly unrelated to whether **Heidi**, specifically, was dangerous.

Plaintiff also relies on her self-serving, uncorroborated deposition testimony in an attempt to imply that Heidi was a vicious dog. However, Plaintiff's testimony that "[Heidi] obviously wanted the package or wanted some type of toy or something. It was a little bit aggressive more than the norm" cannot and does not establish that Heidi had any vicious tendencies. See *Plaintiff's Response*. It is simply Plaintiff's opinion as an interested party based on one unfortunate encounter with Heidi and Province objects to the use of Plaintiff's deposition testimony to prove that Heidi was vicious.

Furthermore, regardless of Plaintiff's objections as to the Provinces' affidavits, it is not Province's job to produce evidence that Heidi is not vicious. To the contrary, *it is Plaintiff's burden to produce evidence that Heidi had vicious tendencies of which Province knew or should have known.* However, no such evidence exists. Plaintiff has failed to produce any credible evidence and, therefore, has failed to meet her burden on the issue of whether Heidi had any vicious tendencies and, if so, Province's knowledge thereof. Simply put, Plaintiff has not raised a fact issue whether Heidi had any vicious tendencies.

### B. *Plaintiff Has Presented No Evidence that Province Knew or Should Have Known that Heidi had Vicious Propensities.*

None of the evidence cited by Plaintiff creates a fact issue as to whether Province *knew* or *should have known* that Heidi might present a danger **because no such evidence exists.**

Again, Plaintiff attempts to rely on various articles about dangerous dog breeds as some "evidence regarding the well-known characteristics of [Heidi]." See *Plaintiff's Response*. However, as asserted above, these articles are nothing more than hearsay and are not in any way credible evidence of Heidi's specific characteristics and propensities. Province objects to the use of these articles as summary judgment evidence on this basis.

Plaintiff also claims that because of Heidi's genetic makeup, Province "knew or should have known [Heidi] might do exactly what [she] was bred to do…" However, this statement is conclusory and completely unsubstantiated by any credible evidence. In fact, Province testified to the contrary:

Deposition of Terry Province, Page 42, Lines 10-19 (emphasis added)

Q.    Well, are you saying that Heidi did not present any risk to Ms. Smith?
A.    Gosh, I've got to tell you that the fence probably and the fence posts and the wasps that have a nest built into the telephone pole right there presented a risk. But, in my mind, **I had never conceived of or considered that the dogs were a risk**. I mean, if that's the – that would be one way to read that statement, was that the risk was purely of the dogs. And I would disagree with reading it that way, is what I'm saying –

See *Plaintiff's Response*, Exhibit F

In an apparent attempt to establish that Province breached any alleged duty owed, Plaintiff relies on Province's actions prior to the incident, arguing that Province's failure to put chicken wire all the way up the gate means that Province was indifferent to public safety. However, as has already been established and as Province has testified, he was not aware of any risk associated with not putting chicken wire all the way up the gate:

Deposition of Terry Province, Page 33, Lines 7-16 (emphasis added)

Q.   Did – was there anything that prohibited you from having – other than simply not having the wire, from having chicken wire run up the full extent of the gate?
A.   **I had no expectation that anything like that was needed.** There was – I had no cause, in other words, to make me think it was needed. And that – I mean, to me, the logical extension of that would be to cover not only the gate but the entire perimeter of the property with chicken wire.

See *Plaintiff's Response*, Exhibit F

Province had no obligation to do any more than he did with the gate and fence around his yard. Province's only duty was to act as a reasonable prudent person under the same circumstances "regarding any **reasonably foreseeable risk**." See *Allen v. Albin*, 97 S.W.3d 655, 666 (Tex. App.—Waco 2002) (emphasis added). Plaintiff's argument would create new Texas law requiring what amounts to strict liability for owners of non-vicious dogs. Plaintiff's attempt to argue that Province was under a heightened duty to put chicken wire all the way up the gate,

despite the fact that Plaintiff has produced no credible evidence that Province was aware that Heidi posed a danger to anyone on the other side of the gate, is not Texas law.

Additionally, Plaintiff relies on *Stein v. Reger* for her assertion that a dog's breed can impact the owner's liability for a dog bite. <u>See</u> *Plaintiff's Response*. However, the court in *Stein* **does not hold,** as Plaintiff asserts, that "a dog's breed can have a direct impact on whether a homeowner is liable for an attack." <u>See</u> *Plaintiff's Response*; *Stein v. Reger*, 2016 Tex. App. LEXIS 5961, 2016 WL 3162589 (Tex. App.—Houston [1st Dist.] 2016). Instead, the court in *Stein* held that because the plaintiff "d[id] not present any evidence of foreseeability," summary judgment was appropriate. <u>See</u> *Stein*, 2016 Tex. App. LEXIS 5961 at *13. The same analysis is applicable here as Plaintiff has failed to produce any credible evidence that the incident at issue was foreseeable.

The defendants in *Stein* testified that the dog at issue had never attacked anyone else and that they "could never have anticipated that [the dog] may have been able to jump over the fence." <u>See</u> *id.* at *12. As in *Stein*, Province has attested to the fact that Heidi has never bitten anyone else (<u>see</u> *Defendant's Motion for Summary Judgment*, Exhibit A) and testified that he could not have anticipated that any of the dogs, including Heidi, would snap at someone close to the gate:

Deposition of Terry Province, Page 21, Lines 10-13 (emphasis added)

Q.   Okay. Were you at all concerned that if someone came up with a package close to the gate, that one of the dogs might snap at them?

A.   **I would never have expected that to happen.**

See *Plaintiff's Response*, Exhibit F

The bottom line is that Province **did not know** and **had no reason to know** that Heidi presented any danger and, therefore, the incident was most certainly not foreseeable. Plaintiff has produced no evidence to dispute this fact. The fact that Province neither knew nor should have known that Heidi presented a danger to Plaintiff is enough, on its own, to defeat Plaintiff's claims. Therefore, Defendant requests the Court grant Defendant's Motion for Summary Judgment in its entirety.

## C. *Plaintiff's Argument that Province Acted with Indifference to the Public's Safety is Without Merit.*

Because Plaintiff has not produced credible evidence that Province was negligent, she cannot succeed on a gross negligence claim. See *In re J.H. Walker, Inc.*, 2016 Tex. App. LEXIS 483 (App.—Dallas Jan. 15, 2016) ("the existence of negligent conduct is a prerequisite to the establishment of gross negligence."). Regardless, in order to establish gross negligence, Plaintiff is required to prove that Province had **actual, subjective awareness of the risk** but proceeded with conscience indifference. See *Mobil Oil Corp v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998). Plaintiff, however, has not produced any evidence on this issue.

Furthermore, gross negligence requires that Province's conduct "create[d] an extreme degree of risk of harming others." *Columbia Med. Ctr. v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2008). An extreme degree of risk is more than a remote possibility of injury or even a high probability of minor harm; it is the likelihood of serious injury to the plaintiff. See *Ellender*, 968 S.W.2d at 921. Plaintiff **cannot** establish that Province's failure to put chicken wire all the way up the gate (before or after the incident) creates the likelihood of serious injury because Province did not have actual knowledge of any extreme risk. As has been established, Province did not know that Heidi posed a danger to anyone on the other side of the gate and, therefore, did not consciously disregard any extreme risk. Plaintiff has produced no evidence to the contrary. Therefore, Plaintiff's gross negligence claim must fail and summary judgment is proper.

## II.
## No Evidence Summary Judgment is Appropriate

Province moved for summary judgment on Plaintiff's claims on the grounds that there is insufficient or no evidence of any essential elements of those claims. Plaintiff failed to produce summary judgment evidence raising a genuine issue of material fact for any elements of any claim against Province. Further, Plaintiff failed to provide actual, proper summary judgment evidence in her response. The exhibits provided by Plaintiff were hearsay, speculative deposition testimony, and/or not evidence of each and every element of the causes of action as required.

Therefore, the granting of Defendant's no-evidence motion for summary judgment is requested and proper.

**WHEREFORE,** Defendant, Terry Province, prays that this Court GRANT his Second Amended Motion for Summary Judgment in all respects. Further, Defendant prays for all other relief, both general and special, in law or equity, to which he has proved itself justly entitled.

Respectfully submitted,

*Abigail K. Christmann*
J. Brantley Saunders
State Bar No. 17681500
Abigail K. Christmann
State Bar No. 24097523
SAUNDERS, WALSH & BEARD
Craig Ranch Professional Plaza
6850 TPC Drive, Suite 210
McKinney, Texas 75070
(214) 919-3555 Telephone
(214) 615-9019 Telecopier
Brantley@SaundersWalsh.com
Abby@SaundersWalsh.com
**Attorneys for Defendant Terry Province**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document, **Defendant's Reply to Plaintiff's Response to Defendant's Second Amended Motion for Summary Judgment**, was served upon all counsel of record on this the 10th day of November, 2017, pursuant to Texas Rules of Civil Procedure 21 and 21a.

*Abigail K. Christmann*